See dissenting opinion of PROVOSTY, J., 43 South. 930.

(43 South. 934.)

No. 16,389.

## DOBYNS v. YAZOO & M. V. R. CO.

(April 15, 1907. Rehearing Denied May 13, 1907.)

1. MASTER AND SERVANT—INJURY TO EMPLOYÉ—NEGLIGENCE—PROXIMATE CAUSE.

Where a railroad employé, with a lighted lantern in his hand, being engaged in the discharge of his duties, is killed upon a dark night, at a terminal station, by being run over by a backing locomotive and tender, and it appears that there was no one on the rear of the tender (being the forward part of the machine as it moved) to keep a lookout, and neither headlight nor white lights, as required by the rules of the company, but, instead, a red light (or marker), as prohibited by such rules; that the fireman was engaged in supplying fuel to the furnace; that the killing of the employé was not known until after he had been run over; and that the violation of the company's rules involved in the handling of the locomotive in the manner described had been habitually tolerated by the company's representatives in charge of the station, and was partly attributable to the failure of the company to furnish a yard engine and to furnish the lights required by such rules—the company will be held liable, in damages, notwithstanding that the employé who was killed may have been at fault, in being on the track, his fault being slight in comparison with that of the company, and the fault of the company being the proximate cause of the accident.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Master and Servant, § 801.]

2. DEATH—DAMAGES—ELEMENTS.

In assessing the damages claimed by the widow for the negligent killing of her husband, the distress and mental suffering inflicted on her by the deprivation of her husband's companionship are, under our law, elements to be considered, and, as her pecuniary loss resulting from the failure of her husband's support is to be made good upon the hypothesis that, though engaged in a hazardous occupation, he would have furnished such support during the unexpired term of a life the average duration of which is to be assumed, the question of the amount that should be allowed is impossible of determination upon any scientific basis. The most that the courts can do, in such case, is to exercise a sound judicial discretion, and award such amount as, all the circumstances considered, may seem just to both litigants, and not unduly oppressive to either.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 15, Damages, §§ 118–120.]

**3. SAME.**

A freight conductor, 32 years old, of good health and habits and earning $1,200 a year, having lost his life through negligence imputed to the railroad company by which he was employed, and his childless widow having obtained a verdict of $25,000 as damages, *held*, that the amount is excessive, and should be reduced to $10,000.

[Ed. Note—For cases in point, see Cent. Dig. vol. 15, Damages, §§ 125–130.]

(Syllabus by the Court.)

Appeal from Twenty-Fourth Judicial District Court, Parish of East Feliciana; Joseph Lindsay Golson, Judge.

Action by Malia D. Dobyns against the Yazoo & Mississippi Valley Railroad Company. Judgment for plaintiff, and defendant appeals. Amended and affirmed.

Wall & Kilbourne, Hunter Collins Leake, and Gustave Lemle (J. M. Dickinson, of counsel), for appellant. Edward Elliott Wall and Robert C. Wickliffe, for appellee.

MONROE, J. Plaintiff, appellee, moves to dismiss the appeal on the ground that the judge, having by an order granted in open court made the appeal returnable in 60 days, subsequently in chambers granted another order fixing a return day, and that the second order was not properly served.

The motion for appeal asks for an appeal "returnable to the Supreme Court * * * according to law," and the order indorsed upon it by the judge on September 21, 1906, reads in part:

"It is ordered that an appeal be granted * * * returnable in sixty days to said Supreme Court," etc.

On September 28th the judge, ex proprio motu, apparently, made a further indorsement on the motion for appeal, as follows:

"In the above order, the court having omitted to fix a determinate day as required by law, the court now fixes Monday, November 12, 1906, as the day on which the appeal herein * * * is made returnable to the Supreme Court of Louisiana. It is further ordered that notice of the fixing of said return day be served on plaintiff herein, or her attorneys of record."

The judgment was signed on September 21st and the appeal was lodged in this court on November 7, 1906.

It does not appear that either of the errors suggested can be imputed to the fault of the appellant or its attorneys. The matter is therefore governed by section 11 of Act No. 45, p. 101, of 1870 (Extra Sess.), which reads, in part, as follows:

"That no appeal of the Supreme Court shall be dismissed on account of any defect, error, or irregularity of the petition, citation, or order of appeal * * * or in the citation of appeal, or service thereof, or because the appeal was not made returnable * * * on a proper day, whenever it shall not appear that such defect, error, or irregularity may be imputed to the appellant or his attorney; but, in all cases, the court shall grant a reasonable time to correct such defects, errors or irregularities, in case they are not waived by the appellee, and may impose on the appellant such terms and conditions as, in its discretion, it may deem necessary for the attainment of justice."

There is no conflict between these provisions and those of Act No. 92, p. 150, of 1900, which require that the judges of the district courts (parish of Orleans excepted) shall fix the return days for appeals in civil cases not less than 15 nor more than 60 days from the dates of the orders, save by consent, and they have been applied on more than one occasion since the act of 1900 was adopted, as they had frequently been applied before that time. Orleans & J. R. Co. v. Int. Constn. Co. et al., 113 La. 409, 37 South. 10; Hodge v. Mercantile Co., Ltd., 105 La. 669, 30 South. 142; Watkins Banking Co. v. Louisiana Lumber Co., 47 La. Ann. 581, 17 South. 143; Pearce et al. v. State, 49 La. Ann. 643, 21 South. 737; State v. Dellwood, 33 La. Ann. 1229; Elder v. City, 31 La. Ann. 500; Chaffe & Sons v. Heyner, 31 La. Ann. 594; State ex rel. Hoey & O'Connor v. Brown, Adm'r, 29 La. Ann. 861. As the appellee has appeared, by counsel, and argued the case on the merits, we do not understand that she desires that its consideration shall be delayed for the correction of the

alleged error in the citation. The motion to dismiss is therefore overruled.

## On the Merits.

Plaintiff, as the widow of Wm. O. Dobyns, lately a freight conductor in defendant's employ, sues to recover the damages resulting to her by reason of her husband's death, which, she alleges, was attributable to the negligence of defendant. The defense is practically a denial of negligence and the allegation that the danger encountered was assumed by the decedent as incidental to his employment. The scene of the tragedy was a station called Wilson, which is a terminal of one division of defendant's road and is one of two stations where trains are made up between New Orleans and Vicksburg, the other being Baton Rouge. The road of the company, at Wilson, runs north and south. The depot, in which the agent and train dispatcher have their offices, stands on the west side of the main track, and the side track is to the eastward, with a space of about 10 feet between it and the main track. The yardmaster's house, and the yard proper, where the cars are "put away," are to the south of the depot, on the same side of the tracks. The time of the occurrence out of which this litigation arises was about 1:30 o'clock a. m. on January 26, 1906. The night was very dark, and there were no lights about the station or yard, save here and there a colored switch signal, with little or no illuminating power. Road engine No. 56 had brought in a train, and was engaged in putting it away, as the company kept no yard engine to discharge that function. It had disposed of all the cars save the caboose (which was standing on the main track, to the north of the depot), and was backing, from the yard, in the direction of the caboose, when it ran over Wm. Dobyns at a point a little to the south of the yardmaster's house, and killed him; the first intimation of the occurrence being received by a switchman who was riding on the pilot of the backing engine, and who became conscious that they had passed over something, though he could not at the time see what it was because of the darkness. He, however, signaled to the engineer, who stopped the engine, and the mangled body of the unfortunate conductor was found in the middle of the main track, the condition of which indicated that he had been rolled, or dragged, under the engine for a distance of about 60 feet. The engineer of No. 56 testifies that he had been looking out to the northward from his side (the west) of the engine, and had seen nothing, save a little white lantern with which the yardmaster, or some one else, was signaling to him from a point near the depot, and that the bell of the engine was ringing continuously, but the fireman testifies that just before the accident he stopped ringing the bell and was engaged in firing up, and the suggestion of the engineer, who admits the truth of the fireman's statement, that a man named Matthews, who was riding in the cab of the engine, might have rung the bell, is met by the uncontradicted testimony of the fireman to the effect that Matthews was at that time engaged in "washing and dressing"; the fact being that Matthews was also an engineer, who, as we infer, was getting in from a run and had merely taken passage on engine 56 at the yard. The switchman testifies that he was riding on the pilot because the engine, being a road and not a yard engine, was not provided with a switch board across the rear of the tender for him to stand on, and the fireman explains the fact that the only thing in the shape of a light that was displayed on the rear end of the tender (being the end that was in front, as the locomotive was moving) was a red "marker," in the following testimony, which defendant has made no effort to impeach or contradict, to wit:

"Q. What lights were on the back part of that engine? A. Red light. Q. Is that the proper light to have on an engine, back there? A. Those are the ones given me to put on. Q. Did you ever ask the company to furnish you any other light? A. I had a white one, but it broke up too many globes. I asked the company for globes, but they wouldn't give me none, so I used the red one. Q. Did that red light you were using give as much light on the track, in the direction in which the engine was moving, as a white light would have thrown? A. No, sir. Q. Was there any brakeman or other person on the back of that engine keeping a lookout at the time that Dobyns was killed? A. No, sir."

The engineer is interrogated and answers as follows, inter alia:

"Q. How many feet ahead of you could you see from the reflection of that red light, as you were moving backward, to the north? A. I couldn't see any space from the red light anything more than a little reflection on the rear of the tender."

The engineer also testifies that he blew no whistle, and that the engine was moving at the rate of three or four miles an hour. It is not pretended that any one was keeping a lookout from the east side of the engine. The following rules of the company appear in evidence, to wit:

"Yard Engine: An engine assigned to yard service and working within yard limits."

"A succession of short sounds of the whistle is the alarm for persons or cattle on the track, and calls the attention of trainmen to danger ahead."

"(18) Yard engines will display the head light to the front and rear, by night. When not provided with a headlight, at the rear, two white lights must be displayed. Yard engines will not display markers." ["Markers" are red lights.]

"(523) Trains and engines must be run with caution when entering, or moving through, sidings or yard tracks, expecting to find them occupied."

"(624) They must see that, when switching is to be done, both engineer and fireman are on the engine so as to observe signals from both sides of the train."

There also appears in evidence a page from defendant's book of rules showing the rear ends of the tenders of two locomotives, the one displaying a red light upon the outside of each upper corner, and having inscribed beneath it the legend:

"Engine running forward by night, without cars, or, at the rear of a train, pushing cars,"

—the other, displaying a white light, upon the top, about midway between the two sides, and bearing the inscription:

"Engine running backward, by night, without cars, or at the front of a train, pulling cars."

The company, it seems, at one time maintained a yard engine at Wilson, but it was taken away, and, for several years past, each road engine bringing in a train which is to be broken up has done its own switching. On the night in question Dobyns was scheduled to take out a train (of probably 17 or 18 cars) which was made up in the yard and was to come out on the siding, and, going north, get on the main track at a switch some distance above the depot. He went to the offices of the agent and train dispatcher, and got from those officials, respectively, his waybills and orders, and then, carrying his lighted lantern, crossed over to the east side on the siding, at a point about opposite the north end of the depot, where he met the yardmaster, with whom he had some conversation, after which they separated; the yardmaster going in a northwesterly direction, towards the caboose which engine No. 56 was to remove, and the conductor going in a southerly direction, towards the place from which his train was to come, and the next thing known of him is found in the statement of the switchman that his attention was attracted by some object over which the engine had just rolled; the distance between the point at which Dobyns parted with the yardmaster and that at which his body was found, being, perhaps, 150 feet. Dobyns' train, it may be remarked, had been put in motion prior to the accident, and at the moment of the accident was moving northward on the siding, whilst engine No. 56 was moving on the main track in the same direction, and, as the caboose of the train was in the rear, it seems

probable that Dobyns had walked down in order to board it before the train should have acquired sufficient headway to make the boarding inconvenient. Whether, at the moment that he was struck by the engine, he was standing on the main track, waiting for the caboose, or was crossing the main track in the direction of the train, or had stepped, or backed, on the main track (from the space between it and the siding) in order to get a better view of his train, it is impossible to say with certainty. The company had for several years been using road engines for yard purposes at Wilson, and, as the decedent had been taking trains in and out of the place, he probably knew of the practice, and it may be that he was aware of the fact that the rules of the company with respect to lights to be used on yard engines were not being observed, though how far his knowledge on that subject extended is a matter of conjecture, as is the extent of such non-observance. The decedent was 32 years old at the time of his death, and in good health. He had been employed as a freight conductor for several years and was competent and efficient. His average earnings were about $1,200 a year. He leaves a childless widow, who was subjected to an outlay of $100 in consequence of his death, and who has been deprived of his companionship and support. The jury before which the case was tried awarded her $25,000, and the trial judge affirmed the verdict. The company has appealed.

### Opinion.

The decedent, in accepting employment as a freight conductor, assumed the risks incidental to that service, including those necessarily involved in the discharge of his duties whilst within the limits of the company's yard, and they were, at best, serious enough. He did not assume the wholly unnecessary risk of the company's disregarding, and permitting its officers and representatives habitually to disregard, the rules established by it, and deemed necessary for the safety of those whose functions were to be discharged in such yards. When he came to his death, he was acting in the performance of his duty, and he had the right to assume that he would be protected to the extent that the rules of the company furnished to him for his information and guidance could afford protection. He was seeking, or waiting, for the train that he was to take out, and the darkness of the night rendered all the more visible to those whose duty it was to keep a lookout the light which he carried. The train, consisting of 17 or 18 freight cars, was moving along on the siding, making the noise which a train of that kind usually makes, and whilst as its conductor, whose duty it was to see that it started in proper condition, and to board and take charge of it, his attention was fixed upon its movements, he was run over and killed by a locomotive which was being operated in violation, not only of the rules of the company, but of the plainest dictates of common prudence. According to the rules of the company, both the engineer and fireman of a locomotive engaged in switching, whether by day or night, whether going forward or backward, should be on the lookout, the one from the one side, the other from the other side; but, in this instance, whilst the engine was backing in the pitch dark, the fireman abandoned his lookout, stopped ringing the bell, and occupied himself with shoveling coal into the furnace. According to the rules of the company, a yard engine should display a headlight to the front and rear, or, if not provided with a headlight, should display two white lights in the rear. In this instance, engine 56, operating within yard limits, and as a yard engine, displayed neither headlight nor white lights upon the end which was in front, as it moved, but displayed a red light, or marker, which it was prohibited from displaying, and

which, according to the rules of the company, should be used to indicate the rear end of a locomotive which is either at rest, or is moving away, and the use of which, in such position upon an approaching locomotive or tender, could not but be misleading. The argument that the nonobservance of the rules in question was habitual seems to us rather to aggravate than to improve the situation, since, not only do the rules appear to us to be wise, but the fact of their adoption by the company indicates that the company so considered them; and, that being the case, and it being a question of life and death, there can be little excuse for the company's toleration of their nonobservance, and still less for its own failure to supply the means for their observance. No one, we believe, can read the record in this case without feeling assured that the negligence of the decedent was but slight in comparison to that of the defendant, and that it was the latter which was the proximate cause of the accident. The night being dark, the engineer and fireman of No. 56, by keeping a reasonable lookout, ought to have seen the decedent with his lighted lantern, even though their position, with the tender in front of them, was not the most favorable. But, as the tender was in front, and as the locomotive was plunging into the darkness, there should have been a lookout in front of the tender; and that there was not was because the defendant had failed to provide an engine with a board upon which such lookout could stand. Upon the other hand, if the engine had been provided with a headlight in front (that is to say upon the rear end of the tender), or with two white lights, the attention of the decedent would most likely have been attracted by the rays piercing the darkness about him, even though no warning were given by the ringing of the bell or the sounding of whistle. But why should the fireman, under such conditions, have desisted from ringing the bell? As the case is presented, then, there were three things which the decedent had the right to assume would be done, and the doing of either of which would, in all probability, have saved his life, notwithstanding his imprudence in being on the track, to wit, the keeping of a proper lookout, the ringing of the bell, and the carrying of the proper lights; and that neither of these three was done was partly the fault of the engineer and fireman, but, in the main, the fault of the company, since it was the company that failed to furnish an engine suitable for yard work and to furnish the proper lights, which were all the more necessary by reason of the unsuitableness of the engine that was used, and it was the company that tolerated the habitual nonobservance of rules established by itself as necessary for the protection of the lives of its employés. In assessing the damages the distress and mental suffering inflicted upon the plaintiff by the deprivation of her husband's companionship are, under our law, elements to be considered, and, as her pecuniary loss resulting from the failure of her husband's support is to be made good upon the hypothesis that, though engaged in a hazardous occupation, he would have furnished her with such support during the unexpired term of a life, the average duration of which is to be assumed, the question of the amount that should be allowed is impossible of determination upon any scientific basis. The most that the courts can do in such case is to exercise a sound judicial discretion and award such amount as, all the circumstances considered, may seem just to both litigants and not unduly oppressive to either. We are of opinion that $25,000 is excessive in this case, and that the amount of the award should be reduced to $10,000.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be amended by reducing the amount thereby

awarded to $10,000, and, as amended, affirmed, the plaintiff to pay the costs of the appeal.