Statement of the Case.
MONROE, C. J.
Plaintiff brings this suit, under the federal Employers’ Liability Act (U. S.- Comp. St. §§ 8657-8665), in her own behalf and in behalf of two minor children, issue of her marriage with R. P. Simmons, who lost his life, through the negligence, as she alleges, of defendant or its agents, while-in the discharge of functions for which he was employed by defendant.
*689 The total amount claimed is $30,000; the total amount awarded by the judge a quo was $5,000. Both litigants have appealed.
The case disclosed by the record is as follows:
Defendant, through its agents, had been engaged for some five months in replacing, with a reinforced concrete bridge, a wooden trestle, forming part of its railroad and spanning the “Jefferson Highway,” near Pineville, in the parish of Rapides, and the work was nearing completion, when, on March 21, 1918, at about 11:30 a. m., decedent, while acting as foreman of the construction gang, was run over and killed by an unscheduled train, consisting of an engine, tender and oil tank, moving backward and pulling five cars, which, approaching from the north, without having given proper warning (as plaintiff alleges), crossed the trestle upon and beneath the surface of which the work was being carried on. The general direction of the railroad is northwest and southeast, and it appears to cross the highway at a right angle. The length of the bridge from the outsides of the abutments is 51.4 feet; the width is probably 40 feet. At the time of the accident, the ■construction gang was at work on the central' pier, which was being molded of concrete, reinforced with iron or steel, in a wooden form, built up from the surface of the highway to, or near to, the surface of the trestle and railroad track — a distance of 15 feet. For the purposes of the work, a wooden tower had been erected on the east side of the track at a point about 35 feet south of the trestle, from which a chute was extended, for the conveyance, by gravity, of the concrete mixture into the form. The apparatus, called a ■“mixer,” in which the rock, sand, and cement were mixed, was located within a few feet of the base of the tower, and was operated by Charles Bose. A few feet to the southward of the mixer there was a hoisting engine, operated by Henry Kimball, whose duty it was to receive the mixture from Bose, in a container called a “bucket” (though probably bearing no resemblance to an ordinary bucket), and, upon signals from the foreman, hoist it up into the tower, where the bucket was automatically emptied into the chute, through which it passed into the form. The duty, and only duty, of Kim-ball and Bose, therefore, was to keep up the supply of concrete and deliver it into the chute as called for by Simmons, and, in order to discharge that duty, it was necessary for them to keep their eyes pretty constantly on Simmons, and that they did so, is shown by their testimony. Thus we quote from the testimony of Kimball:
“Q. I understand you saw him before the accident, when he gave you the signal to hoist the bucket? A. Yes, sir. Q. The first time, of, those two times mentioned, where was he standing? A. On the track. * * * He was standing on the track and gave me the signal to hoist the bucket, and I hoisted the bucket, and about the time that I hoisted the bucket the train struck him.”
He says that he saw the train strike Simmons, the fact being that he was facing in that direction and that the hoisting of the bucket was a matter of but one minute.
Bose testifies that, two minutes, perhaps, before the accident, he was passing on the track and stopped and exchanged a few words with Simmons, and that Simmons gave Kimball the sign to hoist the bucket. just as he was leaving him; he did not see the train strike him, but was immediately informed of that occurrence by Kimball, and, the train having passed, he saw the lifeless body of Simmons on the top of the form, beneath the track, at a point about 20 feet beyond that at which he had been struck, with one arm cut off, the skull crushed, and other injuries. D. E. Blake was keeping a meat market and grocery upon one of the streets on the edge of Pineville. He had seated himself upon the front gallery of his place of business and had a clear view of the'bridge. *691 He saw Simmons on the bridge and watched him for about 10 minutes when he saw the train strike him. Simmons was standing on the bridge, over the form, when struck, and appeared to be giving instructions to his-workmen under the bridge. The witness heard no whistle or bell from the train, and there was no lookout in front. Simmons was looking rather in the direction of Pineville than in that of the approaching train.
The theory of the defense is that Simmons was not standing on the track when the train approached him, but was standing upon what is called a “platform,” which extended out from the west side of the track, and that, when the train was passing in front of him, he stepped into it and was killed by his own act. The train crew consisted of the engineer, a white man named Porter, and two negroes, fireman and brakeman, respectively, named Gordon and Harvey, and it appears from their testimony, and otherwise, that, for two hours or more preceding the accident, they had been engaged in switching operations within a distance of, say, 300 yards, immediately above the bridge, and had, on several occasions, approached to within 50 or 100 feet of it, only to stop and go back; and we assume that those operations were accompanied by a good deal of whistling and bell ringing. When the switching was completed and they were ready to leave for Alexandria, which is a few miles below the bridge, the whistle was blown twelve times at the starting point, called “Silam Spur,” the upper limit of the track over which they had been switching; the purpose being, not to warn any one on the bridge, but to call in the flagman', which having been accomplished, the train was started toward the bridge. At some point below (exact distance not shown) it passed what was called the “car camp,” being a collection of cars on a spur or siding in which the construction gang were housed and fed. The cook there employed testifies that she stood in the door and saw the train p-ass; and that no whistle was then blown, or bell rung, and that there was no lookout on the forward end (consisting of the oil tank). At some distance (not definitely fixed) below the “car camp,” there was a road crossing, and the engineer testifies that, before reaching it, and in time to afford full protection for any one who might be passing on the road, he blew the “crossing whistle” for the crossing and the bridge,, and it does not appear that he again blew for the bridge, though he says that the bell was kept ringing until the bridge was crossed.
Bearing in mind that he had been switching within 300 shards Of the bridge for two hours, and had probably blown the crossing whistle a dozen times, without intending it as a signal for those who were working on the bridge, and well knowing- that it was not so understood by them, though he had approached the bridge to within 50 or 100 feet, his idea seems to have been that, on the last occasion when he blew, at a distance of perhaps 50 yards above the bridge, they should have understood differently, because it was then his intention to cross the bridge. His cross-examination on that point elicited the following, with other, testimony, to wit:
“You said, up to the time that you were within 40 feet of him, and according' to what you state, Mr. Simmons was unaware that the train was approaching. I will ask you why, under the circumstances, and believing Mr. Simmons to be a careless man, you did not give him additional warning? A. IVhat do you mean by additional warning; get down aud make him get off the bridge? Q. No; give him the whistle? A. I blew the whistle 12 times, right there at the end of the camp cars.” .
Considered as an answer to the question propounded that statement was untrue; the 12 whistles not having been blown as an additional warning to Simmons, or at the end of the camp cars, but-as a call to the flagman and at Silam Spur, prior to the starting of the train.
*693 The witness was further cross-examined in regard to the blowing of the whistle, after leaving the starting point, and made the following statements:
He blew when about 100 yards .from the bridge, below the camp cars, which were 150 or 200 yards from the bridge; blew between the camp cars and the road crossing; blew for both the crossing and the bridge (meaning that the one blowing served both crossing and bridge); the crossing is about 75 yards from the bridge; he must have been 50 yards from the crossing when he blew the whistle.
“Q. Now, when you began blowing, I understood you to say that you were 50 yards from the north side of the road crossing? A. I said 50 feet. * * * Q. If you waited until you were 50 feet of that road crossing to blow your whistle, do you think you were giving the persons crossing that road any opportunity to stop before hitting them? A. I told you I would not say exactly how far I was from this crossing when I blew the whistle. Q. Then you think you were about 50 feet, instead of 50 yards, from the road crossing when you began blowing your whistle for the crossing? A. I .don’t know where I was. I blew the usual road crossing like I usually blow and running about 314 miles an hour. * * * Q. What is the usual distance from the crossing at which a road crossing whistle is blown? * * * A. That depends; if it is daylight, everything clear, nobody on the crossing, 50 or 75 yards is sufficient. * * * Q. Do you think your estimate of 50 feet from the road crossing, when you started blowing the whistle, was liable to be erroneous; by that, I mean, do you think that you we\'e really closer or further than 50 feet? A. I was really further than 50 feet; might have b</en 50 or 100 yards. Didn’t pay any attention about the distance; was above the crossing there. I gave full protection to the peojjle at the crossing, at the rate of speed I was running. Q. When you say full protection, you mean you gave the protection you ordinarily do give when you are running an engine? A. Yes, sir; we always blow the road crossing signals, sometimes at 300 yards, sometimes 400 yards, sometimes closer.”
He further testifies that he saw Simmons on the platform, within about four feet of the track, as he approached the bridge; that Simmons was looking in the direction of the tower; and that, when he got within 40 or | 50 feet of him, his view was cut off by the tender and the tank. The brakeman, Harvey, who says that he was sitting on the tender (which followed the oil tank as the train was moving), testifies that he saw Simmons on the platform as he approached the bridge, and that he was looking in the direction of the tower; never turned his eyes toward the train; witness’ view of him was cut off by the tank, at a distance of 15 feet. The fireman, Gordon, who was on the right side of the engine and track (since the engine was backing, being the same side as the platform), says that he saw Simmons on the platform, looking away from the approaching train, but that, when within about four car lengths of him, he (witness) turned his attention to the oil valve on the engine, and thereafter occupied himself by ringing the bell with one hand and handling the oil valve with the other, so that, when he passed the platform, though he could have touched Simmons, if he had been there, he was unable to say whether he was there or not, or what had become of him.
As the finding of Simmon’s body on the form beneath the track was irreconcilable with any theory of his having been knocked off the platform, the engineer was asked whether he could account for that circumstance, and his attempt to do so reads as follows:
”Q. IIow did you or any 'other member of the train crew know that this man had been run over, until you reached Alexandria? A. I did not. Q. Can you state, if this train did run over Mr. Simmons, how it was possible for this man to get on the track and be run over without the brakeman seeing him? A. Yes, sir; there are several different ways, Q. Can you state the ways? A. Mr. Simmons could have dashed into those cars, standing on the platform — looked that way. Q. You mean he committed suicide? A. Looked very much that way. Q. What other way? A. Mr. Simmons could have taken it to be a little engine, and) when the engine got by, stepped up on the track, and the ears got him. Q. You mean, by *695 that, that Mr. Simmons, just after the engine passed him, walked right into the remainder of the train, without looking? A. Don’t say that he did that, say that it could have happened that way. Q. Was there any other way? A. Not unless he turned around and fell off of that platform.”
Beyond the statement thus made, there is not a syllable in the record which suggests the theory that Simmons committed suicide, and the weight of probability is against the theory that he was standing on the so-called platform.
It is not shown that the foreman, or Simmons as acting foreman, had ever undertaken to superintend the work from the platform in Question, and our conclusion is that a more inconvenient place from which to exercise that function could hardly have been found. On the other hand, the place where plaintiffs’ witnesses locate Simmons seems to have been the proper and convenient one, since the men were working immediately beneath him, or, if they moved, he could follow them, on the surface of the bridge, and, if lie found it necessary, as at times he did, he ccdild readily step down into the form and handle the work, such, perhaps, as the adjusting of the reinforcing iron or steel, himself.
Opinion.
[1] Being placed, by defendant, in temporary charge of the building of a concrete bridge on the line of its road, as a substitute for a wooden trestle, the decedent, in the absence of instructions to the contrary (and under some circumstances, perhaps, in any event), was entitled to such precedence over an unscheduled, hauling train, in the matter of the occupation of the incomplete bridge, as the execution of the work for which he was employed may have required, since there could be no trains without a track, and no track, at that point, without a bridge. If. we assume that the builders of the bridge-ware instructed to do their work with the-least possible interference with the running-of the trains — whether scheduled or unscheduled — and that-those in charge of the trains were instructed to run them with due regard to the fact that the bridge had to be, and was being, built, the obligation of those parties, respectively, interdependent, as they were, each upon the other, for the safety of their lives, was to do nothing and to leave nothing undone which would imperil such safety.
.[2] The engineer, it is shown, was asked why, in view of the fact that he saw that Simmons was oblivious of the approach of the train, he did not give him additional warning, and his flippant answer was the question: “What do you mean by additional warning; get down and make him get off the bridge?” It then being explained that the counsel meant to inquire why he did not blow his whistle, he replied that he had blown it 12 times; the fact in that connection being, as we have stated, that he had blown 12 times, before starting from “Silam Spur,” as a signal to his flagman, and that before reaching the road crossing, at a point, say, 150 yards above the bridge, he had blown the crossing signal for the crossing and the-bridge, being the same that he had probably blown a dozen times during the two preceding two hours for the crossing alone, and he-seems to have expected Simmons to understand that the identical signal, which had previously meant the crossing alone, had suddenly come to mean both crossing and bridge. Apart from that, and even though he had not been switching near the bridge and the-occasion of the accident had been the first upon which he had.approached it,, and though he-had blown for the crossing and again for the-bridge, he testifies that he saw Simmons, standing on the platform which has been de *697 scribed; that he kept him in sight until he was within 40 or 50 feet of him, when his view was cut off by the tender, or tank; and that Simmons was looking in a direction other than that of the approaching train. And such was the testimony of the fireman and the brakeman and of Kimball, who’ received a signal from him about that time; the consensus of the testimony being that Simmons’ attention seemed to be concentrated on what he was doing, and that he did not, at any time, turn his eyes in the direction or appeared to be conscious of the approach of the train, which circumstances considered, it appears to us that it would have been a natural and reasonable precaution on the part of the engineer, when his view of Simmons was thus cut off, at a distance of only 40 or 50 feet, either to have blown the whistle, or to have stopped the train, which latter, he says, he could have done within 12 oils feet.
[3] As we see the matter, the engineer had no right of way over the bridge. Simmons, as foreman of the bridgework, was there of right, and, if he considered that the work in which he was at the moment engaged of more importance to his employer than the passage of the particular train In question, it was his duty and his privilege to remain there. It probably was of more importance, since the concrete mixture was just then pouring down through the chute into the form, and it may very well have been that the position of the reinforcing iron or steel required attention, or possibly, there may have been danger that the mixture might overflow the form, or fill it to a higher level than was intended. Certain it is that- the foreman was engrossed in what he was doing, and what he was doing was in plain discharge of the function for which he’had been put in charge of the work. So much was his attention concentrated on his work that the testimony of every witness who saw him points to the conclusion that he heard no signal from, and was wholly unconcious of the approach of, the train; and that he was so unconscious was apparent. The purpose of such signals as may have been given, therefore, failed, and those by whom they were given knew that they had failed, for the engineer admits that up to the last moment, where,’ at a distance of 40 or 50 feet, his view of the foreman was cut off by the tender, he had observed that his eyes were directed toward the tower, from which the concrete was pouring in a steady stream; and the lookout testifies that up to the moment that his view was cut off, at a distance of 15 feet; he had not looked in the direction of the train. If, then, the purpose of a signal be to attract the attention of, and convey information to, the person to whom it is directed, and if he who gives it sees and knows, or has reason to believe, that it fails of its purpose, and a- human life is at stake, it seems plain that something else should be done, or attempted; and, in this instance, there appear to have been at least two things that might have been done, to wit: The whistle might have been blown, and the air brakes might have been applied, as at 40 or 50 feet the foreman, still oblivious to the approach of the train, was cut off from -the view of the engineer. But nothing was done, except to run over the foreman and kill him, and, though it was daylight and he was in plain view of those members of the train crew, and it is said by them that' the train was moving at only 2% or 3 miles an hour, not one of them saw him killed, and only one of them (the engineer) ventured to make the guess that he had committed suicide by walking into the train, or that he might have fallen off the platform, 4 feet outside of the west rail, and have been run over on the track between the rails. Our conclusions are that the negligence of the engineer and crew of *699 the train was the proximate cause of the accident, that the decedent was not at fault, and that he did not assume the risk of that negligence. St. Louis, etc., R. Co. v. Jackson, 78 Ark. 100, 93 S. W. 746, 8 Ann. Cas. 328 and note, 6 L. R. A. (N. S.) 646 and note; Dobyns v. Yazoo & M. V. R. Co., 119 La. 72, 43 South. 934; Bail v. La. & N. W. R. Co., 129 La. 1029, 57 South. 325; Wirth v. Alex Russel Iron Works, 140 La. 1056, 74 South. 551.
[4] And, upon the basis of those conclusions, we are of opinion that the amount awarded by the trial judge is less than it should have been and should therefore he increased. Considering, however, that the question of the measure of the damages to be allowed in cases arising under the federal Employers’ Liability Act is governed by the jurisprudence of the federal courts, that the Supreme Court of the United States has definitely expressed its views upon the subject, and that this court, where the evidence enabled it to do so, has conformed to those views, we are constrained, for lack of the necessary evidence, to remand this case, in order that such evidence may be supplied as is required under the rulings in Chesapeake & Ohio R. Co. v. Kelly, 241 U. S. 485, 36 Sup. Ct. 630, 60 L. Ed. 1117, L. R. A. 1917F, 367; Jones v. Kansas City Southern Ry. Co., 143 La. 312, 78 South. 568.
It is' therefore ordered that the judgment appealed from be affirmed in so far as it rejects the demands of the defendant for the dismissal of the suit, and that, with respect to the demand of the plaintiff, the case be remanded. with leave to plaintiff tó offer such further evidence as may he deemed necessary for the determination of the question of the measure and quantum of damages in the manner indicated in the two cases last above cited; all costs, thus far incurred to be paid by defendant.