269 So.2d 278 (1972)
Robert G. RICHARDSON, individually and on behalf of his minor son, Robert G. Richardson, Jr.
v.
Bernard TATE et al.
Charles A. OSTARLY, individually and on behalf of his minor son, Larry J. Ostarly
v.
Bernard TATE et al.
George W. SCHAYER, individually and on behalf of his minor son, George H. Schayer
v.
Bernard TATE et al.
Robert G. RICHARDSON, Sr., for and on behalf of his minor son, Brian E. Richardson
v.
Bernard TATE et al.
Nos. 4899-4902.
Court of Appeal of Louisiana, Fourth Circuit.
November 8, 1972.
Rehearings Denied December 5, 1972.
Writs Refused January 15, 1973.
*279 Donald V. Organ, Organ & Pierce, Frederick R. Bott, Deutsch, Kerrigan & Stiles, New Orleans, for plaintiffs-appellees.
Gerard M. Dillon, Dillon & Williams, New Orleans, Chester Francipane and Richard T. Regan, Francipane, Regan, Post & St. Pee, Metairie, George T. Oubre, Norco, for defendants-appellees.
Before REDMANN, GULOTTA and STOULIG, JJ.
REDMANN, Judge.
Defendants T. L. James & Co. and its insurer appeal from a judgment on a jury verdict casting appellants for damages caused by a truck driver generally employed by B. T. Moore but determined to have been James's borrowed servant. Plaintiff protectively appeals, asking judgment against Moore if James is held not liable.
The principal question is whether the driver was James's borrowed servant, acting as such at the time of the accident. Also questioned are quantum and liability for interest on the whole judgment from rendition until payment of the primary insurer's portion of principal of the judgment.

Borrowed Servant
The borrowed servant doctrine has been expounded by the Louisiana supreme court in Benoit v. Hunt Tool Co., 219 La. 380, 53 So.2d 137 (1951) (where it was not applied), and B & G Crane Service v. Thomas W. Hooley & Sons, 227 La. 677, 80 So. 2d 369 (1955).[1] Whose work is being *280 done, determined by who has the right of control, is stated as the test for determining whether such borrowing has occurred as will shift from the general employer to the borrowing employer the responsibility for the employee's torts. The question is said to be factual.
The jury was not charged (as requested by appellants) that the general employer's control of his employees is presumed to continue, and that plaintiff had the burden of proving creation of a borrowed employee relationship. Our appellate review of facts makes it unnecessary to determine that this defect in the jury charge requires setting aside the verdict and ordering a new trial. But we feel constrained to disregard the jury's finding on this one issue and make an independent finding.
Moore, owner of the truck involved (and 11 other dump trucks), is a "hauling contractor". Moore hired drivers for his trucks, including Bernard Tate, the tortfeasor here.
Moore agreed to haul asphalt for James from James's asphalt plant in Kenner to a jobsite in Gramercy where James was to construct a parking lot. As customary in dealings between Moore and James (from whom Moore derived 80% to 90% of his business income), the agreement here was verbal and fixed compensation at a stipulated price per ton, based on the average distance to be hauled. Often and perhaps usually this distance was determined by Moore and a representative of James together measuring a route, but Moore was theoretically not obliged to follow the measured route (although the requirement of delivering the asphalt while still hot, and as needed by James's spreader, placed practical limitations on this theoretical freedom to select and use an alternate route).
Those are some of the factors which, appellants argue, show that Moore was an independent contractor, who alone controlled his truck drivers. The use of average mileage (e. g., on a five-mile road paving job) would support a conclusion (despite Moore's contrary impression they could terminate at will) that the parties' agreements contemplated Moore's hauling the entire job. Compensation to Moore by tonnage as opposed to an hourly or mileage rental may be more suggestive of subcontracting than of hiring, as is the basic agreement for the individual job rather than, say, weekly or monthly arrangements.
Nevertheless we conclude that Moore relinquished and James took over the control of Moore's truck-drivers, making them James's borrowed employees for whose torts James and its liability insurer are liable.
A prominent element in our consideration is James's control of quantity and of flow of asphalt from James's plant to James's jobsite.[2] The demands of the asphalt *281 spreader at the site would determine flow and, since asphalt must be spread while hot or else be discarded, Moore's trucks could have to wait or even be temporarily laid off if the spreader slowed or broke down. Or, if distance to job prevented Moore's trucks from maintaining an adequate flow, James would also use some of its own trucks in addition to Moore's. James's employees not only directed the trucks' movement by controlling flow but also determined the load of each 24-ton capacity truck according to site soil conditions. The drivers were subject to the directions of James's men both at loading and unloading; Moore did not have even a theoretical right of control (except in the sense that he did have the naked power to breach his contract by ordering the employees to take his trucks elsewhere or the like). And, while en route, the demands of James's asphalt-spreading required that the driver not significantly deviate from his path, as, e. g., by stopping for lunch. Finally, the operations of James's asphalt plant determined the time at which the drivers would begin and end work each day.
Appellants characterize these circumstances as mere cooperation between James and Moore. We conclude they show control by James, essential to James's job requirements. There is also other evidence of similar import, the strongest of which is that James personnel caused Moore to fire one truck driver by insisting the driver not drive any more even if the truck had to sit idle (and thus cease earning money for Moore).
Under all the circumstances we may compare Moore's truckdrivers with pedestrian employees, hired to move asphalt in wheelbarrows a short distance from plant to job. It is difficult to conceive persons engaged for such transportation as independent contractors; see Hickman v. Southern Pac. Transp. Co., 262 La. 102, 262 So.2d 385 (1972). Substantial control must of necessity reside in the person providing asphalt and superintending its laying. If our case is somewhat less clear,[3] we consider it in principle the same.
We are similarly unable to hold that control of the drivers reverted to Moore while the trucks were en route. They were sent from plant to jobsite only when asphalt was needed, and returned from site to plant when more was needed, all according to determinations made by James. We cannot separate the return trip from the overall operation.
We conclude that the driver was James's borrowed servant, acting as such at the time of the accident.

Quantum
Appellants' brief thus describes the injuries involved:
"The injuries to Brian consisted of a concussion and contusion of his brain, which rendered him semiconscious for approximately two and one-half weeks but resulted in no residual brain damage, multiple pelvic fractures, including a fracture of his acetabulum, which were treated by simple bed rest, fractures of two transverse processes in his lumbar spine, a comminuted fracture of his right ankle, a fracture of his left ankle and the loss of several teeth. He was initially hospitalized from August 5, 1967, the date of the accident, until October 12, 1967. He was rehospitalized on three subsequent occasions, namely, from November 15 to November 29, 1967, from February 27 to March 2, 1969 and from August 27 to September 4, 1969, and on *282 these occasions he underwent two fusion operations on his right ankle, the first of which failed to take. In the repairs to his teeth he had inserted a permanent, nonremovable, bridge consisting of fourteen teeth. By January 16, 1970, his right ankle was fused, and he had no further symptoms. His treating orthopedic surgeon was then of the opinion that he should have no further pain in that joint. His residual disability consists of a one inch shortening of his right leg and the stiffness of his right ankle joint on account of the fusion. He is disabled from working or standing for long periods of time and from climbing, squatting or walking on uneven surfaces. He is not disabled from doing sedentary work. As of the time of trial he was a university student. The disability of his right lower extremity, which was his only residual disability, was estimated at forty percent. There was no evidence introduced with respect to the loss of future wages or income. The jury awarded him $85,000.00 for his injuries and residual disability.
"Robert Richardson sustained a laceration of his right eyelid, a broken nose which was reduced with cosmetic results `considered to be excellent', a partial laceration of the triceps muscle in the vicinity of his right elbow which healed in a relatively short period of time without any significant disability, a compound comminuted fracture of his right femoral shaft and a fracture of his right femur. He was initially hospitalized from August 5 to October 13, 1967, and was thereafter rehospitalized from December 17 to December 21, 1967, from January 11 to January 26, 1968 and from May 13 to May 28, 1968. During his initial stay in the hospital he was in traction for two months and was placed in a spica cast upon his discharge. His first rehospitalization in December, 1967 was for the purpose of the removal of the spica cast and for physiotherapy. However, his fracture angulated while he was in the hospital and he was put back in a spica cast. Two weeks later it angulated again while in the cast, and his readmission in January, 1968 was for the purpose of a bone graft operation on his right femur. Following this, he was again put back in a spica cast until May 13, 1968. His hospitalization in May, 1968 was for the purpose of physiotherapy. However, he fell while in the hospital and sustained a fracture of the femoral condyle of the same leg that had been previously fractured, and a leg cast was thereafter applied. In July, 1968 this cast was removed, and by August 14, 1968 he was allowed to start bearing weight on the leg. By October 16, 1968 there was no longer any pain in his leg or hip. His treating orthopedic surgeon last saw him on January 14, 1969, at which time his residuals consisted of a slight bowlegged deformity of his right leg, that leg was one-half inch shorter than his left, and there was a slight loss of flexion and extension thereof which, the doctor thought, might improve some. The permanent partial disability of his right lower extremity was estimated at twenty percent. Again there was no evidence of loss of future income or wages. The jury awarded Robert $40,000.00"
Appellants argue the awards should be reduced because manifestly excessive, comparing cases such as Herrin v. Perry, 215 So.2d 177 (La.App., 1968), aff'd 254 La. 933, 228 So.2d 649.
We are unable to agree that general damages quantum is excessive as to either Brian or Robert Jr. We are unable to find abuse of the jury's "much discretion", C.C. art. 1934 subd. 3.
Appellants also object to the award to Richardson Sr. of his wife's lost wages of $62.50 weekly for the entire 48 weeks she attended the teenage Brian and Robert Jr., arguing that only the first two and a half weeks are compensable. The evidence satisfies us the boys needed someone to *283 care for them. We believe it highly improbable that a practical nurse could have been hired for less than the federal minimum wage of $1.60 an hour. The wife's lost wages, amounting to less than that cost, are compensable. Berry v. Gulf Coast Constr. Co., 229 So.2d 368 (La.App., 1970).
However, the $3,000.00 lost wages, $18,659.80 medical expenses and $2,100.00 automobile damage do not total the $26,000.00 jury award to Richardson Sr., and the judgment on that particular must be reduced by $2,240.20 to $23,759.80 total (of which, as the trial court correctly adjudged, James's insurer, as an excess insurer, has no liability for the $2,100.00 property damage fully covered by the primary insurer).
Similarly, the jury award to Charles A. Ostarly exceeds the proof by $2,000.00 and the judgment must be reduced by that amount.
(In our decree, both reductions will be made from that portion of those parents' awards for which James and its insurer were cast. Since the primary insurer remains liable for the total of $52,100, reapportioning all awards is unnecessary.)

Liability for Interest on Judgment
James and its insurer complain that Moore's insurer, by its own policy's terms, was liable for interest not only on its own principal liability from demand until payment but also on the balance of judgment principal from rendition of judgment until payment by Moore's insurer of its part of principal, as in McCrossen v. Bieszczard, 234 So.2d 763 (La.App.1970). Both James and its insurer third-partied Moore's insurer for indemnity within the latter's policy limits, noting that James is an insured within the policy terms.
James's insurer's policy makes it liable only for the excess of James's liability beyond the collectible primary insurance (afforded by Moore's insurer). As an excess insurer it cannot be held liable for that part of the interest (or any other liability) for which Moore's insurer is liable.
James itself, on the other hand, remains liable for the entire amount of principal and interest and on its third-party demand it should have indemnity from Moore's insurer to the extent of its policy obligations.

Decree
The judgment is amended (1) to reduce the quantum against James and its insurer, National Surety Corporation, in favor of Richardson Sr. to $14,597.27 and in favor of Charles A. Ostarly to $2,359.87; (2) to decree National Surety Corporation's liability for interest on all judgments against it to be interest from judicial demand until paid, except that National shall not be liable for interest from date of judgment until date of payment by Employers Mutual Liability Insurance Company of Wisconsin of principal of all judgments against Employers; and (3) to grant the third-party demand of James for judgment over against Employers to the extent of the first $50,000.00 of James's liability for personal injuries and $2,100 for property damage, plus legal interest on those amounts from judicial demand until paid, plus legal interest on the entire amounts of all judgments against James from date of judgment until date of payment by Employers of the principal amount of the judgments totalling $52,100.00 against itself, plus all costs of trial. In all other respects appealed the judgment is affirmed. National is to pay the costs of this appeal.
STOULIG, Judge (dissenting).
I respectfully dissent. Applying the controlling jurisprudence expressed in the case of Benoit v. Hunt Tool Co., 219 La. 380, 53 So.2d 137 (1951), I am of the opinion that the plaintiffs failed to bear the burden of proof necessary to establish that the truck driver, Bernard Tate, was the borrowed servant of T. L. James and Co., Inc. *284 (T. L. James), at the time of the accident and resultant injuries to the plaintiffs. More specifically there is insufficient evidence to preponderate in favor of the conclusion that the normal relationship of employer and employee between Tate and his general employer, B. T. Moore, had been suspended and superseded by a new and like relationship between Tate and T. L. James.
The record affirmatively shows that B. T. Moore is an independent contractor engaged in the business of hauling and had in his employ a truck driver, Bernard Tate. It is undisputed that Moore alone hired his drivers, trained them, controlled them, and maintained all of their individual work records necessary under governmental regulations.
In connection with a paving contract, T. L. James contracted with Moore to haul hot asphalt, at a specified price per ton to be evidenced by a load ticket, from its plant at Kenner, Louisiana, to the paving site in Lutcher. The parties mutually agreed upon a specified route from the plant to the paving project for the purpose of ascertaining the distance of the haul. The route was not binding upon Moore and his employees, and in fact, Moore had himself selected the route being used by his trucks on the date of the accident.
The only control exercised by James over the truck drivers was directing the position of the trucks at the asphalt plant so that they would be properly aligned beneath the hopper for loading. Later upon arriving at the jobsite the movement of the truck and the discharge of its cargo would be controlled by James employees so as to coordinate it with the requirements of the spreader laying the asphalt. Thus the sole supervision performed by T. L. James was in connection with the loading and discharging of the cargo and at all other times Tate was under the direction of his employer, Moore. This limited direction by T. L. James was not an assumption of control as would give rise to a borrowed servant relationship but was required to obtain the cooperation necessary to achieve a common purpose. The proper fulfillment of the drayage contract by Moore necessitated coordination with the paving activities of T. L. James in order to accomplish the purpose for its existence.
Mere division of control over an employee in various minor phases of his activity is not sufficient to create a borrowed servant relationship, where control is still exercised by the general employer. The most liberal construction in favor of the plaintiffs that can be placed on Tate's relationship with T. L. James is that he would be a borrowed servant while under the direction of James at the plant or paving sites. When traveling between these terminii he would again revert to the status of Moore's employee, since he would then be directly engaged in furtherance of Moore's hauling business.
Under the rationale of the majority opinion a person would be unable to enter into a continuing or recurring contract of drayage with an independent contractor without incurring the legal responsibility of the driver becoming his borrowed servant, because a certain amount of direction and regulation is always involved in the performance of this type of agreement.
I respectfully dissent from the majority opinion that under the facts and circumstances of this case Bernard Tate was the borrowed servant of T. L. James and Co., Inc.
Amended and affirmed.
NOTES
[1] We here note Restatement of Agency 2d § 227's Comment C:

"A continuation of the general employment is also indicated in the operation of a machine where the general employer rents the machine and a servant to operate it, particularly if the instrumentality is of considerable value. Normally, the general employer expects the employee to protect his interests in the use of the instrumentality, and these may be opposed to the interests of the temporary employer. If the servant is expected only to give results called for by the temporary employer and to use the instrumentality as the servant would expect his general employer would desire, the original service continues. Upon this question, the fact that the general employer is in the business of renting machines and men is relevant, since in such case there is more likely to be an intent to retain control over the instrumentality. A person who is not in such business and who, gratuitously or not, as a matter not within his general business enterprise, permits his servant and instrumentality to assist another, is more apt to intend to surrender control." (See also Illustration 5.)
The Restatement thus might support results contrary to that of B & G Crane and that we reach here.
[2] Similar proof was apparently not present in Suckle v. Hartford Acc. & Indem. Co., 163 So.2d 564 (La.App.1964), writ refused 246 La. 582, 165 So.2d 481, where the driver of a truck hired for an asphalt-delivering trip was held not a borrowed servant. Also in Suckle the court found a specific contract for the trip.
[3] It is possible to consider Moore as basically a truck-provider, with legal implications quite different from, e.g., the hiring of a mechanic with his own hand-tools. But for B & G Crane, supra at note 1, we might conclude that, at least when returning the truck from site to plant, the driver was doing no more than making the rented machine available to James and thus was doing the work not of James but of Moore.