354 So.2d 213 (1977)
Mrs. Nancy Nuebel, widow of Burton T. BLANCHER, Individually and as natural tutrix and administratrix of minors Burton T. Blancher, II and Leslie Kay Blancher
v.
Grady SAMUELS et al.
John L. DIMICELI, Jr.
v.
Grady SAMUELS, a/k/a Grady Samuels, Jr., et al.
Nos. 7750 and 7751.
Court of Appeal of Louisiana, Fourth Circuit.
December 13, 1977.
Rehearings Denied January 11, 1978.
Writs Refused February 24, 1978.
*215 Leonard A. Washofsky, Jackson & Hess, New Orleans, for Mrs. Nancy Nuebel Blancher, et al., plaintiffs-appellants-appellees.
W. Paul Andersson, Hammett, Leake, Hammett, Hulse & Nelson, New Orleans, for Hendee Haulers and Employers Commercial Union Ins. Co., defendants-appellants.
Dillon & Williams, Gerard M. Dillon, New Orleans, for T. L. James & Co., Inc. and Aetna Casualty & Surety Co., for Autry Young, defendant-appellee.
John J. Hainkel, Jr., Porteous, Toledano, Hainkel & Johnson, New Orleans, for John L. Dimiceli, Jr. and The Allstate Ins. Co., defendants-appellants.
Melvin W. Mathes, Beard, Blue, Schmitt & Mathes, New Orleans, for Grady Samuels, Hamilton Miller, Jr., H & M Truck Service, Inc., The Fidelity & Casualty Co. of N.Y. and Market Ins. Co., defendants-appellants.
Steven K. Faulkner, Jr., Morphy, Holbrook & Faulkner, New Orleans, for John L. Dimiceli, Jr., plaintiff-appellee.
Before BOUTALL, SCHOTT and BEER, JJ.
These appeals were originally heard by a 3 judge panel who agreed on every issue save one, damages for loss of love and affection of decedent. As to that issue alone, reargument was granted before a 5 judge panel as provided by Article 5, Sec. 8(B) of the Louisiana Constitution of 1974. The separate decisions are handed down herewith:

ON THE ORIGINAL HEARING
BOUTALL, Judge.
These appeals arise from a judgment pursuant to a jury verdict awarding damages to the plaintiffs in two consolidated cases arising from an automobile-truck collision. Because of the numerous parties and the legal issues presented, it is necessary to set out the posture of the case briefly.
A suit for damages was filed by Mrs. Nancy Nuebel Blancher, in her own behalf and on behalf of her minor children, as the result of the wrongful death of Burton T. Blancher, her 29 year old husband and the children's father, which occurred on November 11, 1970 in the City of New Orleans, when the 1969 Chevrolet in which their decedent was a guest passenger collided with a dump truck, fully loaded with sand, on temporary Interstate Highway 10 at a point about 250 feet east of the Burg Canal Expansion Bridge. Made defendants in this suit were Grady Samuels, Jr., the operator of the dump truck; H & M Truck Service, Inc., the dump truck's owner; Fidelity & Casualty Company of New York, and Market Insurance Company, insurers of H & M Truck Service, Inc.; Hendee Haulers and Commercial Union Insurance Company; L. Murphy Trucking Service, Inc. and Consolidated Underwriters (the latter two parties and their insurers being sued under the theory that Samuels, the dump truck driver, *216 was a borrowed employee of either one or the other of them); Autry Young, an employee of/and T. L. James & Company, Inc. and Aetna Casualty & Surety Co. (T. L. James was sued under three distinct theories of liability: 1) Samuels was a borrowed employee of T. L. James: 2) T. L. James was vicariously liable for the negligence of Young while acting as temporary flagman; and 3) T. L. James was guilty of independent negligence proximately causing the accident); Boh Brothers Construction Co., Inc. and Travelers Insurance Company (these parties were voluntarily dismissed by the plaintiffs, inasmuch as the portion of highway involved was under the construction and supervision of T. L. James); John L. Dimiceli, Jr. and Allstate Insurance Company (the owner-operator and the insurer of the 1969 Chevrolet in which plaintiffs' decedent was a passenger).
Before trial, plaintiffs Blancher compromised and settled all claims against L. Murphy Trucking Service, Inc. and its insurer Consolidated Underwriters.
Dimiceli filed a suit against all of the same parties as plaintiffs-appellants-appellees Blancher, for injuries he sustained in the accident. The two suits were consolidated and tried together before a jury.
The jury returned special verdicts finding that the collision was caused by the negligence of Samuels, and that at the time of the accident he was a borrowed servant of Hendee Haulers. The jury exonerated Dimiceli and Autry Young, but found that T. L. James was guilty of negligence proximately causing the accident.
The jury awarded damages to the Blanchers in specific categories. Mrs. Blancher was awarded $20,000 for loss of support from the earnings of her deceased husband from the date of the accident until the day of verdict, and $40,000 for loss of future support. She was awarded "none" for the loss of her husband's love and affection, grief and mental anguish, past, present and future, and nothing for decedent's conscious physical pain and suffering from the accident until his death. Each of the children were awarded the sum of $5,000 for the loss of support from the date of the accident until the verdict, and $22,500 for the loss of future support until reaching the age of majority. They were awarded nothing for loss of love and affection, etc. Dimiceli was awarded $3,000 for his injuries.
Fidelity & Casualty Company of New York and Market Insurance Company paid their policy limits and appealed on behalf of Samuels devolutively. T. L. James and Hendee Haulers and their insurers appealed suspensively. Plaintiffs Blancher appealed devolutively from the dismissal of H & M Truck Service, Inc., Autry Young and John L. Dimiceli. Plaintiffs Blancher also appealed on the basis of the inadequacy of the awards made by the jury, seeking an increase in amount of loss of support and seeking an award for the loss of love and affection.
The first issue to be considered is the negligence of the two drivers, Samuels and Dimiceli. While their testimony agrees as to the events leading up to the area of the collision, they differ as to how the collision happened. Dimiceli's version was that Samuels' dump truck, loaded with dirt, had pulled onto the road at the intersection with Paris Road and had proceeded along in front of him, until it began to slowly and gradually pull off the road and stop on the shell shoulder. As his car drew abreast of the dump truck, suddenly the dump truck's left front came out on the road and there was nothing he could do to avoid the impact. The right front of his car struck the left front tire of the dump truck. Samuels' version was that he had pulled off the road in response to a signal from one of T. L. James' workmen, Autry Young, whom he understood was hailing him to stop so that he could dump his load of river sand. He came to a complete stop with his truck fully off the roadway parallel to it and remained stopped until the Chevrolet driven by Dimiceli ran into his truck while still completely on the shoulder.
The Dimiceli account was corroborated by the testimony of two witnesses, Osker Thomas, who was driving a pile truck just *217 behind Dimiceli, and Wallace Alphonso, Jr., who was working across the roadway from the collision, and by the physical facts testified to by the investigating officer of the New Orleans Police Department, Patrolman Mack.
Thomas, who was driving one vehicle back from Dimiceli, testified that the vehicles were all behind the dump truck proceeding at about 35 or 40 miles an hour when the dump truck pulled off onto the shoulder of the road and got all of the way off of the pavement, about a foot to 2 feet. At that point he saw the dump truck's reverse light come on and he noticed that the dump truck backed up and cut his wheel to back off the road in such a manner that caused the left front wheel to come out on the pavement of the highway, at which time there was an immediate collision with the Dimiceli automobile. He further testified that there was no indication by way of sign or flagman that the truck would be backing up. He repeated many times over in his testimony that there was no doubt in his mind but that the Samuels dump truck had entered onto the highway with his left front tire and fender and that the Dimiceli car was in its proper lane of traffic and not speeding at the time of impact.
Wallace Alphonso, Jr., an engineer's aide employed by Boh Bros. Construction Company, was working across the highway prior to and at the time of the accident. He testified that he saw the entire accident and the occurrences immediately prior thereto. His testimony supports that of Thomas to the effect that he saw the line of vehicles with the dump truck in front, etc., coming at a low rate of speed down the highway, saw the dump truck pull off to the right shoulder and then, after stopping just for a moment, begin to back up and during this backing maneuver the front of the dump truck came back onto the road striking the Dimiceli automobile which was passing at the time.
The testimony of these two witnesses is further corroborated by the testimony of Patrolman Mack who specifically noted gouge marks on the surface of the road made at the point of impact between the vehicles. In his investigation he made a number of measurements and noted the locations of the vehicles and damages to the vehicles. From these physical facts he concluded that the point of impact was approximately 73 inches onto the paved roadway. Additionally there were photographs entered into the evidence which would seem to negate the accident happening in the manner described by Samuels.
The Samuels' version of the accident, that his truck was parked completely off the paved roadway and was stopped, was supported by the testimony of the temporary flagman, Autry Young, and Ouida Robin, a cateress serving sandwiches across the highway at the time of the accident. The testimony of this last witness may be disregarded entirely because she states that when she drove upon the scene the dump truck was already parked on the side of the road and was there for at least ten minutes before the accident occurred. This flies in the face of the testimony of every other witness concerned. The testimony of Autry Young is also suspect to some degree, because at the moment of impact he was walking away with his back to the area and he could not see the impact. Nevertheless both of these witnesses testified that the dump truck was stopped and that Dimiceli was passing the piling truck at a great rate of speed immediately before swerving back into his lane of traffic, apparently lost control and collided with the dump truck.
The jury made a specific finding of negligence on the part of Samuels and no negligence on the part of Dimiceli. We believe that a fair analysis of the evidence offered supports such a finding. Additionally, because of the conflict in testimony, we note that in reaching its verdict the jury must have believed the Dimiceli version and the witnesses in support of it as opposed to the Samuels version and the evidence in support of it. We of course are governed by the rule of Canter v. Koehring, La.Sup. 1973, 283 So.2d 716, that where there is evidence before the trier of fact, which, upon its reasonable evaluation of credibility, *218 furnishes a reasonable factual basis for the trial court's finding, on review the appellate court should not disturb this factual finding in the absence of manifest error. Our evaluation of the testimony and the evidence convinces us that there is no manifest error on the part of the trier of fact and we would affirm the jury's findings in that regard.
We now pass to a consideration of the negligence of Autry Young, the flagman, and T. L. James, his employer. It should be noted that the jury returned a finding of no negligence on the part of Young, but did find negligence on the part of T. L. James.
The evidence concerning Young is that he was a labor employee of T. L. James, engaged in hooking up pipes with one of the construction gangs. His crew was one man short and for that reason the foreman Willie Chamberlain was operating a front-end loader. As they needed more sand in their operation, Chamberlain told Young to stop the approaching Samuels' truck for more mud. Young testified that he gave the truck driver a hand-signal to pull over to the side of the road, when the truck was about 100 to 150 feet in front of him. Samuels then pulled his truck onto the shoulder and stopped 5 or 6 feet past Young. Young testified that he told Samuels to pull up and remain there until the front-end loader was moved and the area was prepared to take the sand. He then turned and walked away from the truck when the collision happened. He denies any attempt to direct Samuels to back up, and indeed Samuels says that he was stopped at the time of the collision. Accordingly there was no evidence to show that Samuels' subsequent maneuver was under the direction of Young. Thus we find, as did the jury, that there was no negligence on the part of Young. He was simply told to have the truck pull over onto the shoulder and he did so, and the truck was in a place of safety.
The jury, in its special findings, found negligence on the part of T. L. James and that its negligence was a proximate cause of the collision. Because of the finding of no negligence by Young, T. L. James' employee, the verdict had to be based on the proposition that T. L. James was negligent in its breach of the duty of care owed to motorists who were using the roadway while the construction job was going on.
The roadway in question was a well travelled, important, through highway and, because it was proceeding through largely unoccupied territory, was subject to being travelled at relatively high speeds. T. L. James & Company, Inc. was the prime contractor for the construction of a new highway in this area, and was required to maintain traffic while engaged in construction. The general area was marked by signs such as "Road Construction Ahead", "Speed Limit 45 miles per hour" and "Do Not Pass". T. L. James contends that these signs were sufficient to put drivers and particularly Dimiceli on notice that one could expect construction type activity alongside the road. On the other hand, we note that there were no signs warning Dimiceli or other motorists that trucks would be unexpectedly entering or leaving the highway at this worksite off of the highway. Further T. L. James had no flagmen on the highway at this point either to flag down construction vehicles or control other vehicular traffic.
The issue here is not one of finding of fact, the facts are clear, but the application of law to those facts. The trial judge gave the following jury charge which we believe to be a correct summation of the applicable law.
"A contractor is under a duty to give reasonable notice to the traveling public on a highway under construction or undergoing repairs and open to public use of any unusual or hazardous condition of the road created by said construction or repair. However, the mere breach or commission of an act of negligence does not alone render the contractor liable for damages resulting from an accident on such a highway.
"The act of omission or act of commission must be a proximate cause of the accident. Where a motorist involved in *219 an accident is already aware that work is in progress in the area, aware of the speed limit therein, and already has knowledge of any notice or warning which is a contractor's duty to give, any insufficiency of such warning is not considered to be a proximate cause of the accident. However, if a specific hazard exists not known to and a contractor has knowledge or should have knowledge thereof, the contractor has a duty to give reasonable notice to the traveling public of the specific hazard in question. Failure to give such a reasonable notice may constitute proximate cause.
"The failure of a person to anticipate that another will act negligently does not constitute negligence."
The evidence shows that driver Dimiceli was well aware of the construction going on. In fact he was proceeding at a reduced rate of speed because of it. As stated by the court in Muse v. W. H. Patterson & Co., 182 So.2d 665 (La.App. 1st Cir. 1965):
"The purpose of signs was to impart knowledge on a road condition to the traveling public. If it already possesses this knowledge, the signs then become superfluous."
The question narrows down to whether T. L. James should have had a flagman controlling traffic at this point. Had the accident occurred because of the manner in which the dump truck left the road or stopped, there would be a basis of the jury finding we could support. However, this accident was caused by the action of the truck driver in backing up from a safe position contrary to his instructions. It is not reasonable to impose on T. L. James the duty to determine that the driver would violate his instructions and engage in an independent act of negligence. If there was some negligence on T. L. James, through its use of an untrained flagman to direct this truck, that negligence is not a proximate cause of the accident. The negligence of the truck driver is the sole proximate cause. See Muse v. W. H. Patterson & Co., supra; Sumrall v. Aetna Casualty & Surety Co., 124 So.2d 168 (La.App.2nd Cir., 1960); Harvey v. Great American Indemnity Co., 110 So.2d 595 (La.App.2nd Cir. 1958).
We reverse the verdict against T. L. James.
Having disposed of the issues of negligence, we now pass to the assessment of liability against those parties not primarily negligent but who may be vicariously responsible for the negligence of Samuels, the dump truck driver.
When plaintiffs Blancher filed their suit, it was contended that although Grady Samuels, Jr. was the employee of Hamilton Miller, or H & M Truck Service, Inc., his corporation, at the time of this accident, that employer-employee relationship had been suspended, and in fact Grady Samuels, Jr. was the employee of one of three possible parties: a) T. L. James, under the theory of Richardson v. Tate, La.App. 4th Cir. 1972, 269 So.2d 278; or b) L. Murphy Trucking Service, Inc., under the theory that once Samuels left in H & M's truck # 83 from its yard and arrived at the Murphy sandpit, he was under the control and supervision of Murphy in all of his activities, and was effectively working for Murphy in the completion of its contractual obligations with T. L. James to furnish river sand to the jobsite; or c) Hendee Haulers, which co-partnership had effectively taken over Murphy's contract with T. L. James to provide trucks and drivers to the James construction site and furnish the sand it ordered. As has been stated above the jury found that at the time of this accident, Samuels was the borrowed servant of Hendee Haulers, and we agree.
Counsel for Hendee Haulers contend that Samuels was an employee of H & M, and that Hendee Haulers acted simply as a truck broker in securing H & M's services to Murphy, and that Hendee's only interest in the matter was to collect $1 per load payment for financing the operation. Relying on the case of Benoit v. Hunt Tool Company, 219 La. 380, 53 So.2d 137 (1951) they contend that the general employer is presumed to be and remains the employer until there is a contrary showing sufficient to overcome the presumption, and that the *220 test for such a determination is who had the right of control over the individual at the time of the accident. It is urged that the intentions of the parties are of paramount importance in this determination, citing Barrois v. Service Drayage Company, 250 So.2d 135 (La.App. 4th Cir. 1971). We are further referred to a number of decisions involving particular points of employer-employee relationship and are especially referred to 2 cases which, because of a similar factual situation, are deemed controlling of the issue here. Hanover Insurance company v. Security Insurance Company, 191 So.2d 672 (La.App. 2nd Cir. 1966) and Johnson v. Royal Indemnity Company, 206 F.2d 561 (C.C.A. 5, 1953).
We do not dispute the tests announced in the Benoit case, and indeed we endorse them. However, we believe the factual circumstances here to be different than those in Benoit and the other two cited cases. The evidence in this case shows that L. Murphy Trucking Service, Inc. had entered into a contract with T. L. James & Company for furnishing and delivering in place some 473,000 cubic yards of river sand at a price of $1.45 per yard to be used by James in the construction of a segment of Interstate Highway 10. Murphy was in the businesses of owning and operating sand pits from which sand was excavated to be placed upon its own trucks for delivery to customers, or to be sold to other truck operators for their own purposes. For some time Murphy carried on its business with T. L. James, furnishing daily the sand required as ordered by T. L. James. T. L. James exercised no control over any of the trucks, and simply placed its order for the necessary amount of sand to be delivered at particular places along the construction work. The only control over the drivers exercised was to point out to them the place where the sand was to be dumped. Under these facts, the jury found that driver Samuels was not a borrowed employee of T. L. James, and we agree.
In the course of time, Mr. Murphy became ill and Mrs. Murphy was having difficulty in carrying on the Murphy business. She had been approached earlier by Alex Palama, representing Hendee Haulers, a partnership between him and Louis Johnson, with a proposition that Hendee Haulers would take over the T. L. James contract. This she had refused, but when it became apparent that she could not supervise the entire Murphy operation, she decided to accept Palama's offer. According to the agreement between them, Mrs. Murphy would operate her sand pit and supervise the loading operations. Palama, and Hendee Haulers, would take charge of the furnishing of the necessary trucks and the delivery operation. Mrs. Murphy testified that Palama was to have control over all of the trucks, making sure that the trucks were on the job and that everything was run perfectly. She required that Palama furnish insurance, both workmen's compensation and liability insurance, to cover the trucks on the job. For this, Hendee Haulers was to be paid $1.00 a load.
Although Palama's testimony contradicts this agreement, when we consider the rather evasive nature of the testimony of Palama and the jury's finding, we conclude that the testimony of Mrs. Murphy is more credible and formed a basis for the jury verdict. It should be noted that it was expected that the income to Palama and Hendee Haulers would come to approximately $50,000 on this job. In addition, Hendee Haulers contracted with Mrs. Murphy for furnishing the materials for another job of land fill, called the Complex Job which was also a rather extensive operation. Because of the large number of trucks involved in these operations, Palama secured a number of trucks from different trucking companies in order to fulfill his quotas.
The evidence further shows that the procedure as to utilization of the trucks was as follows: Palama contacted H & M truck Service, the employer of Grady Samuels, and the owner of the truck involved in the collision. H & M furnished several trucks per day to Hendee Haulers, and each morning the trucks would depart the H & M yard and proceed to Murphy's sand pits. From that time on they were completely *221 under the control of Palama who ordered them to haul sand to either the T. L. James jobsite or the Complex jobsite. On the date of the accident Samuels' truck had carried eleven separate loads of mud, the first load to the T. L. James job, then two to Complex and the balance to the T. L. James job, at which time the accident happened.
The resolution of the issue of the right of control such as would constitute an employee-employer relationship is dependent upon the facts in each case. It is apparent from the above related facts that L. Murphy Trucking Service, Inc. did not exercise any control over the truck in question, but that all control over the truck was vested in Hendee Haulers, through its partner, Palama. Although the record reflects some dispute about the extent of this control, there is ample evidence to show that once the truck left the H & M yard, Palama was the man who issued the orders controlling its use. This control was complete except for the limits as expressed by Miller of H & M that he could not expect the truck to do anything illegal or dangerous, as he put it "As long as it was within limits, in other words, if he was to tell them to go drive the trucks off in the river they ain't going to do that. They're only going to do what is right." While it is shown that the driver Samuels was paid by Miller, who had hired him, and who could fire him, nevertheless he could be removed from this particular job of hauling by Palama at will, and Palama was required to carry insurance protecting him and the truck. We believe that these facts constitute a sufficient basis to support the jury's finding that driver Grady Samuels, Jr., was indeed the employee pro hac vice of Hendee Haulers and we affirm that finding.
We now pass to a consideration of the quantum of damages awarded.
The plaintiffs Blancher have appealed that portion of the judgment relating to quantum contending that the damages awarded were so inadequate as to be an abuse of discretion by the jury. The jury awarded Mrs. Blancher $20,000 for loss of support from date of accident in November, 1970 until date of trial in March, 1975. She was awarded $40,000 for future loss of support. Each of the two minor children were awarded $5,000 for loss of support from accident until trial and $22,500 for loss of future support until they reached the age of majority. The Blanchers rely upon the testimony of an economist, Dr. Goodman, of Tulane University who testified that considering the factors of the expected working lifetime, the expected or projected future income, and the means of finding a sum which, if invested today in the safest possible way, would pay the survivors that income which the decedent could be expected to earn, less his own personal maintenance expenditures, that figure would be approximately three times the amount that which was awarded.
We note that there is no mathematical formula to determine how much an award for wrongful death and resulting loss of support should be. McFarland v. Illinois Central Railroad Company, 241 La. 15, 127 So.2d 183 (1961). The income tax return submitted in evidence in this case shows that for the year of decedent's death, decedent had a reported income of $6,766.00 which was derived from the operation of a small grocery and a small electronics business owned and operated by him. The income tax for the two years prior to decedent's death showed an even lower income for the decedent. We note that the award for loss of support from date of accident to date of trial fairly approximates an amount consistent with the past earnings. On the other hand, the amount that was awarded for future support is considerably less than the amount sought.
To counter plaintiff's claims, the defendants argue that the jury would only properly consider an award for loss of earnings in an amount sufficient that if invested in a safe manner it would return an amount of income yearly sufficient to replace the amount of support that was supplied by the decedent previously. As evidence of this there was submitted examples of investments such as bank or homestead certificates of deposit, investment in Blue *222 Chip stock, and other relatively safe investments. In considering all of the evidence, while it is our opinion that the amount awarded for future loss of support is rather low, we cannot say that the trier of fact abused its discretion in fixing the amount of the award and substitute our opinion for the amount determined.
Plaintiffs further point out that the jury failed to award anything for the pain and suffering that the deceased may have experienced prior to his death. We note that at the time of the collision, Blancher was asleep in the front seat of the car. He survived the impact for several minutes, but the evidence shows (although only by lay testimony) that he was never conscious to any extent other than that he was breathing and made some gurgling and choking sounds. There is nothing to indicate that he was aware of what happened to him or that he suffered any conscious pain. Blanchard v. Rodrigue, 340 So.2d 1001 (La.App. 1st Cir. 1976). There is no basis for such an award.
However, we note that the jury refused to award any sum to plaintiffs for their loss of love and affection and their grief and mental anguish due to the death of their husband and father. On this issue we have disagreed and in accordance with La. Constitution of 1974, Art. 5, § 8(B), we have referred it to a 5 man panel of this court for reargument and decision as to whether the amount of damages should be increased.
A final element of these appeals to be considered is the argument of Employers Commercial Union Insurance Company, insurer of Hendee Haulers. This insurer contends, under the insurance policy of H & M Trucking Service carried by Fidelity & Casualty of New York and Market Insurance Company, and the jurisprudence of this state, that H & M's insurers are liable for the amount of interest accrued on the entire judgment, or their pro-rata share thereof, until the insurance policy proceeds are paid. For this proposition we are referred to the case of Richardson v. Tate, 269 So.2d 278 (La.App.1972). However we note that the Richardson case does not stand for the proposition as contended. The primary insurer is liable for the interest on the judgment up to the amount of the coverage of the primary policy, and the excess insurer is liable for the remainder of the interest on the judgment.
We affirm the judgment of the trial court as to liability for the interest on the judgment.
Accordingly, for the reasons above expressed, we reverse that portion of the judgment finding T. L. James & Company, Inc. and Aetna Casualty & Surety Co. liable and dismiss the judgment against them. We affirm the judgment in all other respects, pretermitting the issue of whether the quantum of damages awarded should be increased.
REVERSED IN PART; AFFIRMED IN PART; SUBMITTED FOR REARGUMENT IN PART.

ON REARGUMENT
Before LEMMON, STOULIG, BOUTALL, SCHOTT and BEER, JJ.
BOUTALL, Judge.
These appeals were originally heard before a three-judge panel of this court. One of the appeals was by Mrs. Nancy Nuebel Blancher, for herself and on behalf of her minor children, assigning as error, along with issues already considered, the failure to grant some award for loss of love and affection, grief and anguish resulting from the death of husband-father, Burton T. Blancher.
In this case the jury was issued a set of special verdicts and interrogatories because of the complexity of the legal situation and the number of parties involved. See C.C.P. Art. 1811 and 1812. We reproduce here the pertinent part that applies to Mrs. Blancher.
"10. What sum of money, paid in cash today, would fairly compensate Mrs. Nancy Nuebel Blancher for the death of her husband in each of the following respects:

*223 (a) The amount to reasonably reimburse her for the loss of support reasonably to be expected from the date of the accident, November 11, 1970 until today, from the earnings of Burton T. Blancher
$20,000.00
(b) The amount to reasonably reimburse her for the loss of support reasonably to be expected from today until the expiration of Burton T. Blancher's working life expectancy from the earning of Burton T. Blancher
$40,000.00
(c) The amount to reasonably reimburse her for the loss of her husband's love and affection and the grief and mental anguish she may have sustained and might reasonably continue to sustain as a result thereof
None"
(d) The amount to reasonably compensate for the conscious physical and mental pain and suffering if any, sustained by Burton T. Blancher from the accident until his death
None"
Similar special findings were addressed on behalf of each child resulting in each being awarded $5,000 for loss of support to trial date and $22,500 for loss of future support until reaching the age of majority. Each was awarded "NONE" for loss of love and affection, etc.
We can find no basis in the record for the jury's failure to award the surviving spouse and the minor children a sum as appropriate compensation for the loss of their husband-father. Such an award is clearly authorized under our Codal law. C.C. Art. 2315 grants, among other things, the surviving spouse and children the right to recover the damages which they sustained through the wrongful death of the deceased. These damages include not only loss of support, but also loss of the love and affection of the decedent and the grief and anguish of the survivor. Cacibauda v. Gaiennie, 305 So.2d 572 (La.App. 4th 1974); Tillman v. Canal Insurance Co., 305 So.2d 602 (La.App. 1st 1974). While the jury has much discretion in fixing such damages under C.C. Art. 1934(3), it errs as a matter of law in refusing to fix any at all when the facts show entitlement to some amount. For a similar situation, see Robinson v. General Motors Corporation, 328 So.2d 751 (La.App. 4th 1976) wherein the jury answering "interrogatories" awarded "None" as damages for pain and suffering.
The stipulations show that Burton Blancher was married to Nancy Nuebel and the father of the two minor children. At the time of accident, Blancher was 29 years old, Mrs. Blancher was 26, Burton Jr. was 8 and Leslie 6. The Blanchers had been married for 8½ years.
A number of witnesses testified that the marriage was a happy one and that the family association was very close. The Blanchers had known each other since their early teens and had never dated anyone else seriously. Mrs. Blancher worked with her husband in his business and it is apparent that both of them took pains to accommodate each others wishes and to make their married life more enjoyable. Considering the working hours of the parents, there was an excellent relationship with the children. Mr. Blancher spent considerable time with them and there was mutual love and affection between them.
Based on these facts we would award the sum of $25,000 to Mrs. Blancher as surviving spouse, and the sum of $12,500 each to Burton Jr. and to Leslie, the children.
We recognize that these sums are somewhat lower than recent awards in comparable cases, but we feel constrained to fix the amount at the lowest adequate amount the jury may have awarded. Although this is not a situation where we simply increase an inadequate award, we conclude that the principle announced in Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976) is still persuasive to our setting an amount here at the lowest adequate amount. We call attention *224 that the entire jury awards are on the low side and we should fix a comparable award.
Accordingly, we would amend the judgment appealed and as affirmed by the original panel by increasing the amount of the award as follows:
"That there be judgment herein in favor of plaintiff, Mrs. Nancy Nuebel Blancher, in the full sum of $87,718.78, and in favor of Mrs. Nancy Nuebel Blancher as tutrix and administratrix of the estates of the minors Burton T. Blancher, II, in the sum of $40,000.00 and Leslie Kay Blancher in the sum of $40,000.00."
AMENDED AND AFFIRMED IN PART.
BEER, J., concurring in all respects but one, and in that instance, dissenting.
LEMMON, J., concurring.
BEER, Judge, concurring in all respects but one and, in that instance, dissenting.
I am in full agreement with the majority regarding all aspects of this opinion except that portion of same which changes the jury's action regarding loss of love and affection.
In my view, the jury is properly presumed to have given clue consideration and deliberation to the entirety of plaintiffs' claims. Their refusal to respond to this particular aspect of plaintiffs' demands (or their selective determination that this part of plaintiffs' claims had been adequately taken care of in the overall totality of the awards to plaintiffs) constitutes, I believe, a reasonable, responsive and, accordingly, acceptable basis for handling the matter as they did. In my view, the jury considered and, for reasons best known to them, cogently rejected this aspect of plaintiffs' claims. This is reenforced by my belief that the original quantum of the awards, as rendered in the trial court, would have all been properly affirmed by this court had they been before us as the result of a general verdict, not itemized. Accordingly, I respectfully dissent from this portion of the opinion.
LEMMON, Judge, concurs and assigns reasons.
When the finder of fact, whether a jury answering special interrogatories or a trial judge, itemizes awards for each specific element of damages in a tort case, an appellate court should review the judgment on an item by item basis and apply the pertinent standard of appellate review to each item.
Some elements of damages are susceptible of calculation to a greater degree of mathematical certainty than others. The existence of separate standards for reviewing differing types of evidence on various elements of damages demands that each award be reviewed separately.[1]
Thus, if the record in an automobile accident case contains uncontradicted evidence that plaintiff sustained a property damage loss of $100.00 after being reimbursed by his collision insurer for all of that loss except the deductible, and the trier of fact awarded $200.00 for this item, the award should be reduced. Or if the trier of fact awarded zero, the judgment denying that item should be reversed in that respect. The reviewing court should take such action even if the cumulative amount of all awards, viewed in relation to all the damages sustained, would not warrant modification, because in each case the trier of fact committed a demonstrable error of law.
In the present case the trier of fact's denial of any award for loss of love and affection was erroneous as a matter of law. This court must correct that error, notwithstanding the adequacy or insufficiency of the total award in relation to the total damages.
LEMMON, Judge, concurs in the denial of the application for rehearing and assigns reasons.
I agree with plaintiffs' contention on application for rehearing that we are not *225 bound in this case by the Coco rationale that an appellate court can modify an award only to the extent of raising it (in the case of an increase) to the lowest point reasonably within the discretion of the trier of fact. This case does not involve the modification of an award for loss of love and affection, etc., but constitutes reversal of the jury's denial of a plaintiff's demand for general damages. The award should be fixed solely on the record, without according any weight whatsoever to the jury's denial of that demand.
However, since the awards had been set by two members of the original panel and concurred in by one judge added to comprise the five-judge panel, I simply concur that the awards are within the range of reasonable discretion.
Furthermore, I wish to add the following observation in support of my original concurring opinion.
When an appellate court reviews a lump sum jury verdict in a tort case involving several elements of compensable damages, the appellant who contends that the jury failed to award a proper amount for example, for loss of love and affection, grief, mental anguish, etc., is usually unsuccessful because of the difficulty in demonstrating the jury's intention as to an award for any specific element of damages. Thus, in view of the wide discretion allowed the trier of fact as to some elements of damage, it is difficult for the appellant to demonstrate that the jury erred as a matter of law on the award for any particular element.
This situation does not obtain, however, when the jury answers interrogatories as to each element of damages. The jury's intention is stated as to each award, and either party has the opportunity to demonstrate error of law in each award.
The appellant in this case demonstrated an error of law in the jury's patent failure to grant any award for general damages for loss of love and affection, grief, mental anguish, etc. We must correct this error, irrespective of the correctness or incorrectness of any other portion of the judgment, as it cannot reasonably be assumed that the jury compensated for this apparent error in the other two awards involving loss of support.
NOTES
[1] For example, a specific award for loss of wages in a personal injury case involves evidence of the period of disability and the rate of earnings, and it would be manifestly unfair to review such an award by use of the standard applicable to awards for pain and suffering.