KLIEBERT, Judge.
On January 17, 1978, a tractor-trailer, owned by the Hertz Corporation, Truck Leasing Division, plaintiff-appellee (hereafter Hertz), was being driven by Perry Wilkerson on Interstate 10 heading west towards New Orleans. Wilkerson was an employee of Fimis Transfer, who was originally a defendant herein but was subsequently dismissed by Hertz. At approximately 3:00 o’clock P.M., just past the twin bridge over Lake Pontchartrain, the truck, while traveling in the left lane, hit a “wet spot” on the road, which spot was covering all three west-bound lanes and which also covered a bump or “knot” in the road. After hitting the wet spot and the bump, Wilkerson lost control of the tractor-trailer and struck the curbing of the left-hand neutral ground, causing the tractor-trailer to flip onto its left side and skid.
Prior to the accident, Boh Bros. Construction Company, Inc., defendant-appellant (hereafter Boh Bros.) had been engaged in construction work at the site. Boh Bros, was replacing the shoulder of the neutral ground (left hand) side of the westbound lane, and on the day of the accident, was pumping muddy water (which had accumulated due to rains) from the point of construction to another area of the neutral ground. However, the area the water was pumped to was overflowing and consequently running across the westbound lanes to the outside (righthand) shoulder of the highway.
Hertz sued Boh Bros., contending Boh Bros.’ actions were the cause of the accident; hence, Boh Bros, was liable for damages to Hertz’s truck. After trial on the merits, judgment was rendered in Hertz’s favor in the amount of $9,394.16. Boh Bros, appeals.
*1283 On appeal, Boh Bros, relies on two assignments of error. First, Boh Bros, contends the trial court erred in finding the accident of January 18, 1978 was due to the fault of Boh Bros. Instead, Boh Bros, contends the negligence of Perry Wilkerson, the driver, was the sole proximate cause of the accident.
Wilkerson testified that when he saw the signs saying “Under Construction”, he slowed down from about 58 miles per hour to 50 miles per hour. He then came upon a slick area composed of water and sand. As soon as he ran over the area, he hit a knot in the road (which knot was covered by the sand) which caused the tractor to bounce, causing him to lose control of the rig. Wilkerson recalled the slick covering two lanes of the roadway. He did not see the slick until he was approximately ten feet from it, nor were there any flagman or other warnings to warn oncoming motorists of the danger. Wilkerson witnessed another accident approximately thirty minutes after his when an automobile hit the same slick area and crashed.
Ross Latino was a grade foreman for Boh Bros, at the site of the accident. He admitted Boh Bros, had pumped water across the highway from approximately 9:00 A.M.— 2:30 P.M. on the day of the accident and that some sand was mixed with the water. Latino further testified that although the pumping operations had terminated approximately 20 minutes before the accident, no one washed or cleaned the residue from the surface. Latino testified to there being three signs warning of the construction— one at 1500' prior to the site, one at 1000' prior to the site, and one at 500' prior to the site. Additionally, there was a 10' barricade (referred to as a wing barricade) at the beginning of the construction zone. Latino further stated there were no puddles or standing water on the highway at the time of the accident, but there was sand on the highway.
Edwin Barrios, inspector for the Louisiana Department of Highways, corroborated Latino’s testimony regarding the signs. Barrios’ daily report, admitted into evidence, shows the weather to have been cold and cloudy with a drizzle. While Barrios did not witness any water or sand being pumped onto the highway, he stated that such actions are generally prohibited because it is considered an unsafe practice.
Michael Nuessley, the investigating officer, did not recall either a wet spot or knot or bump in the road, nor did he remember looking for one. His accident report described the road surface as being “wet and muddy,” and it further reflected that Wilkerson told him that he (Wilkerson) had been riding in the center lane when Wilkerson hit the slick area. Nuessley admitted he had no independent recollection of the accident and was testifying strictly from his accident report.
Blancher v. Samuels, 354 So.2d 213 (La. App. 4th Cir. 1977), writs denied 355 So.2d 257, 263, accepted the following summation of law in cases such as these (at 218-219):
“A contractor is under a duty to give reasonable notice to the traveling public in a highway under construction or undergoing repairs and open to public use of any unusual or hazardous condition of the road created by said construction or repair. However, the mere breach or commission of an act of negligence does not alone render the contractor liable for damages resulting from an accident on such a highway.
The act of omission or act of commission must be a proximate cause of the accident. Where a motorist involved in an accident is already aware that work is in progress in the area, aware of the speed limit therein, and already has knowledge of any notice or warning which is a contractor’s duty to give, any insufficiency of such warning is not considered to be a proximate cause of the accident. However, if a specific hazard exists now known to and a contractor has knowledge therefor, the contractor has a duty to give reasonable notice to the traveling public of the specific hazard in question. Failure to give such a reasonable notice may constitute proximate cause.” (emphasis added)
*1284 In the instant case, there were no signs or other warnings indicating that any type muddy water, mud, sand or other materials were on the road. This fact, coupled with Boh Bros.’ failure to clean the highways and to keep the same clear for safe passage, constitutes negligence on Boh Bros.’ part, which negligence the trial court found to be the proximate cause of the accident. We find no error in this finding by the trial court; this assignment of error lacks merit.
Simply stated, the second assignment of error is that the trial court abused its discretion in its award of damages to Hertz. Appellants contend the property damage award of $9,354.16 should only have been $5,289.04, which was the lowest estimate for repair which was submitted to Hertz.
Anthony Palermo, comptroller for Hertz, testified the truck was repaired by Craft Motor Company, Inc. (hereafter Craft), who usually does Hertz’s repair work. It was stipulated that repairs totalled $10,387.56. On cross-examination, Palermo admitted Craft does not perform all of Hertz’s repair work, but that International Harvester had done some in the past and their work had been satisfactory. Palermo further admitted Hertz had received an estimate from Independent Appraisal of $5,289.04 and that Craft’s original appraisal was for $8,351.52.
Robert Fine, an appraiser, testified his appraisal for the damages was $9,354.16. Fine explained the disparity between his bid and the bid submitted by Independent Appraisal was because of differences in parts prices and number of hours of labor estimated for repairs. Fine admitted he obtained his parts prices from Craft, not from International Harvester.
Jack Craft, the owner of Craft Motor Company, Inc., testified that he computed the price for parts by taking his cost and marking the price up 25-30%. Craft testified that he accepted the appraisal of Fine, completed the repairs, then billed Hertz an additional $933.40 for hidden damages.
Ed Badinger, an appraiser, estimated damages at $5,289.04. Badinger used the same crash manual that Fine used in making his estimate. He admitted two appraisers could see damages differently, and refused to say that Fine’s appraisal was inflated or erroneous. Badinger further admitted his prices for parts were based on fleet prices, which were available to Hertz but not to Craft. Although he testified he had used a manual to determine the amount of labor, his estimate did not have an itemization of the labor. He corroborated Fine’s testimony that the major differences between his and Fine’s appraisals were due from the difference in pricing the parts, the labor cost ($18.50 as opposed to $15.00), and the estimate of the length of time needed to perform the repairs.
Russell Alongi, assistant service manager for International Harvester’s body department, stated he had informed Hertz he would perform the necessary repairs for Badinger’s estimate plus unseen damages. Under cross-examination, he admitted he didn’t examine the vehicle carefully, but relied mainly on Badinger’s estimate of damages.
Louis A. Schwartz, Jr., owner of Louis Schwartz International Trucks, Inc., detailed the price schedule available for International Harvester parts. The schedule has four levels; first, if the buyer owned one to four trucks, he paid list price; second, if the buyer owned between five and twenty trucks, he would pay “C.T.” price, which is 30-35% over cost (which is what Craft paid); third, if the buyer had over thirty trucks, he would pay “clarified C.T.”, or “contract” price, which is 25% over cost; fourth, for special accounts (such as Hertz), fleet prices were available at cost plus 10% if purchased over the counter or at cost only if a stock order was submitted.
Boh Bros, argues that Hertz was under a duty to minimize its damages by either allowing International Harvester to repair the vehicle (where parts’ cost would have been cost plus 10%) or by Hertz ordering the parts themselves by submitting a stock order to International Harvester and then *1285 supplying the parts to Craft (the parts’ price then would have been “at cost”). In short, Boh Bros, argues that Hertz failed to mitigate its damages.
Darnell v. Taylor, 236 So.2d 57 (La.App. 3rd Cir. 1970) discussed mitigation of damages as follows (at 61):
“The doctrine of mitigation of damages applies in this state ... This doctrine, sometimes called the doctrine of unavoidable consequences, imposes on the injured person a duty to exercise reasonable diligence and ordinary care in attempting to minimize his damages after the injury has been inflicted. The care and diligence required of him is the same as that which would be used by a man of ordinary prudence under like circumstances. He need not make extraordinary efforts or do what is unreasonable or impracticable in his efforts to minimize the damages, but his efforts to minimize them must be reasonable and according to the rules of common sense, good faith and fair dealing.” (citations omitted; emphasis added)
It would have been impractical for Hertz to buy the parts, bring them to Craft and expect Craft to perform the repairs without earning any profit on the parts. Nor was it unreasonable for Hertz to have Craft repair the truck, since Craft was the usual repairmen for Hertz trucks, had a good reputation for performing and was among the largest, if not the largest, truck repairmen in the City. In addition, Hertz paid the total cost of repairing the truck ($10,-287.56), which was some $933.40 above the judgment awarded by the trial court. This $10,287.56 represents an actual “out-of-pocket” expenditure by Hertz long before the trial date. In addition, it cannot be said that Hertz was certain to collect the full amount of damages from Boh Bros, when it made the decision to allow Craft to perform the repairs. It was not alleged nor proven Fine’s appraisal was improper, unreasonable and not according to prevailing trade practices. (In fact, Ed Badinger, the appraiser for Independent Appraisal, refused to say that Fine’s appraisal was inflated or in error.)
In order to lower an award, we must determine that the award is above the highest point which is reasonably within the trial court’s discretion. Beal v. New Orleans Public Service, Inc., 365 So.2d 1118 (La.App. 4th Cir. 1978).
Given the foregoing, we find no such abuse of discretion in the amount awarded by the trial court here. The award being within the reasonable limits of the trial court’s discretion, the judgment is affirmed, costs to be paid by the appellant.

AFFIRMED.