623 F.2d 1084
 6 Fed. R. Evid. Serv. 1154
 Ingrid CROCE, Administratrix of the Estate of James Joseph
Croce, etc., et al., Plaintiffs,
Linda Cortese et al., Plaintiffs-Appellees,
v.
BROMLEY CORPORATION, doing business as Roberts Airways and
Mustang Aviation, Inc., Defendants-Appellants.
 No. 78-2627.
 United States Court of Appeals,
Fifth Circuit.
 Aug. 14, 1980.
 
 L. W. Anderson, Robert C. Johnson, Dallas, Tex., for Mustang.
 Royal H. Brin, Jr., Patrick F. McGowan, Dallas, Tex., for Bromley.
 Thomas A. Demetrio, Chicago, Ill., Tom Davis, George M. Fleming, Austin, Tex., for plaintiffs-appellees.
 Appeal from the United States District Court for the Northern District of Texas.
 Before AINSWORTH and GEE, Circuit Judges, and HUNTER,* District Judge.
 GEE, Circuit Judge:
 
 
 1
 On the evening of September 20, 1973, a Beech Model 18 Aircraft carrying singer Jim Croce and his entourage (the "Jim Croce Group" or the "group") crashed shortly after takeoff from the Natchitoches, Louisiana, airport. Among those killed was Croce's road manager, Kenneth Dominick Cortese, whose wife and son are the plaintiffs in this wrongful death action.[1]
 
 
 2
 Initially, we recite only the most pertinent facts; other relevant ones are detailed in our discussion below of the numerous legal issues. On September 18, 1973, Bill Breedlove, the Director of Operations of Mustang Aviation, Inc. ("Mustang"), entered into an agreement with Lloyd St. Martin of Variety Artists International, Inc. ("Variety Artists"), a booking agency for popular singers, to provide an aircraft to fly the Jim Croce Group from Shawnee, Oklahoma, to Columbus, Mississippi, to Natchitoches, Louisiana, and then on to Dallas. Mr. St. Martin wired Mustang the agreed upon fee ($952.63). Later that day, Mr. Breedlove learned that the aircraft he had planned to use to transport the group was disabled. He thereupon contacted John Roberts, President of Bromley Corporation, d/b/a Roberts Airways ("Roberts Airways"), who agreed to provide a Roberts Airways plane and pilot to fly the charter for Mustang.[2] Whether the group or its booking agent was ever notified that Roberts Airways had been substituted for Mustang is disputed by the parties. In any event, the Roberts Airways plane, flown by Robert N. Elliott, followed the itinerary until its fatal crash on leaving Natchitoches airport on September 20.[3]
 
 
 3
 The circumstances surrounding the airplane crash and the cause of the crash were hotly contested at trial. There was conflicting evidence as to whether the pilot's negligence for example, his failure to perform a full preflight check of the aircraft or his taking off downwind into a "black hole" or his having had a heart attack was the cause of the crash. Taking off at night, the plane was airborne only a short while before crashing. Everyone aboard the plane died instantly. Some marijuana and other controlled substances were found in the plane's debris, and a small amount of marijuana was found on the body of the plaintiffs' decedent.
 
 
 4
 Linda and Eric Cortese, decedent's wife and minor son, brought this wrongful death action against both Mustang and Roberts Airways. See n.1, supra. Three separate trials were held, each addressing a different question, and this appeal involves aspects of all three trials. At the first, bench trial, held in July 1976, the sole material issue was Mustang's liability for the actions of Roberts Airways. The trial judge rejected plaintiffs' theories of vicarious liability, respondeat superior, and joint venture but held Mustang liable on two alternative grounds: (1) Mustang was liable for the acts of its agent, Roberts Airways, and was estopped from denying that agency; and (2) Mustang was liable as the agent of an undisclosed principal (Roberts Airways). The court denied an interlocutory appeal. At the second trial, held in August 1977, a jury found that the pilot's failure to exercise the highest degree of care was a proximate cause of the airplane crash. In a separate order, the trial court held that "as a matter of law," the defendants were "common carriers who owed plaintiffs' decedent( ) the highest standard of care." Therefore, in accordance with the jury's verdict, the court held defendants Mustang and Roberts Airways jointly and severally liable for plaintiffs' damages. The third trial, on the issue of damages, resulted in a jury verdict for plaintiffs in the following amounts: $250,000 for care, maintenance, and support; $10,000 for household services; $20,000 for love, affection, counsel, and guidance; and $20,000 for sorrow, mental anguish, or grief suffered as a result of the decedent's death.[4]
 
 
 5
 Both Roberts Airways and Mustang bring this appeal, alleging numerous errors in the second and third trials. With respect to the second trial, they challenge the district court's denial of their motions for a directed verdict, a judgment n. o. v., and a new trial; its holding as a matter of law that the defendants were carriers who owed the highest degree of care to plaintiffs' decedent; its admitting certain evidence with respect to the pilot's prior conduct; and its failure to appoint a guardian ad litem to protect the interests of decedent's minor son. From the third trial, defendants appeal the court's admitting certain testimony concerning the decedent's future earnings, its refusing to give an instruction that any damages awarded by the jury would not be subject to federal income tax, and its permitting the jury to award separate damages for mental anguish and loss of love and affection. In addition, Mustang appeals the district court's holding in the first trial that it is liable for the actions of Roberts Airways. We will initially discuss the issue of Mustang's liability, as determined in the first trial, and then proceed to consider the other issues seriatim.
 
 Mustang's Liability
 
 6
 The district court concluded as a matter of law that "Mustang is estopped to deny agency because Mustang led the Croce group to believe that Robert Elliott, the pilot, was Mustang's agent, flying Mustang's airplane," and that "(t)he Croce Group reasonably relied, to its detriment, on Mustang's implied promise that Mustang would fly the charter flight." Thus, it held Mustang liable for the actions of Roberts Airways and its pilot, Robert Elliott. Alternatively, the court found Mustang liable as "the agent of an undisclosed principal."[5] Mustang contends that it is not liable under either theory. We disagree. We hold that Mustang is liable for the actions of Roberts Airways and its pilot on estoppel grounds.[6]
 
 
 7
 Mustang asserts that the district court erred in allocating the burden of proof on the estoppel theory. The following statement from the court's explanatory Memorandum and Order, issued after Mustang challenged its Findings of Fact and Conclusions of Law, provides the basis for Mustang's assertion: "Mustang was under a duty to speak. Mustang did not. The burden of avoidance of this breach of duty by proof that the Croce group learned from sources other than Mustang of the substitution (of Roberts Airways) can hardly be placed upon the Croce group." (emphasis added).
 
 
 8
 The remainder of the Memorandum and Order, however, makes clear that the district court properly placed the burden of proving estoppel on the plaintiffs and that he was persuaded by the evidence adduced at trial that plaintiffs had carried that burden. In the margin, we quote in full the relevant portion of the Memorandum and Order.[7] This language reveals that the allegedly erroneous statement to which Mustang points concerns merely an alternative estoppel theory, the breach of a duty to speak,[8] that was, in the court's words, "(w)holly apart from the direct evidence of nondisclosure, which in this court's view would directly meet the burden of proof argument . . . ." (emphasis added). The direct evidence was provided in large part by Richard Linden, a Mustang employee. Linden testified that he had contacted a member of the group on the road and left word that a substitute aircraft would be provided;[9] however, he also indicated that he was not likely to have informed the person that the substitute would be provided by Roberts Airways or that Mustang would no longer be responsible for the flight. The district court found, as a matter of fact, that
 
 
 9
 there is no credible evidence that Richard C. Linden informed the Croce agent that Roberts (Airways) was the owner and operator of the substitute or that Roberts (Airways) was solely responsible for the flight, nor did anyone secure the Croce Group's agreement to the change from the original contract. While the evidence on this point is sparse, the reasonable inferences from the evidence left the court with the firm belief that no such communication occurred.
 
 
 10
 In light of Linden's testimony, this finding is not clearly erroneous. Fed.R.Civ.P. 52(a). Nor is the finding that no one "in the Croce Group knew or should have known that Mustang was not responsible for the flight or that Roberts (Airways) was flying it in Mustang's place." Besides the direct evidence of nondisclosure provided by Linden, the district court relied on testimony given by the president of Roberts Airways that it was customary for Roberts Airways not to disclose to customers that they were substituting for Mustang. The inferences drawn by the trial court from this evidence are reasonable.[10] Because the factual findings detailed above fully support the district court's conclusion that the plaintiffs carried their burden of proof on the estoppel issue, we hold that Mustang is estopped from denying that Roberts Airways was its agent and is liable for the acts of that agent.
 
 
 11
 Denial of Defendants' Motions for a Directed Verdict,
 
 Judgment N.O.V., and New Trial
 
 12
 Defendants claim that there was insufficient evidence of the pilot's negligence to support a jury verdict for plaintiffs in the second trial and that the district court therefore erred in denying their motions for a directed verdict, a judgment n. o. v., and a new trial. Having thoroughly reviewed the trial transcript, we are firmly convinced that the defendants' position is without merit. Boeing Co. v. Shipman, 411 F.2d 365 (5th Cir. 1969) (en banc), sets out the standard by which to measure the denial of a motion for a directed verdict or for a judgment n. o. v. Shipman mandates that we consider all of the evidence in the light most favorable to the party opposed to the motion in this instance, plaintiffs. "(I)f there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury." Id. at 374.
 
 
 13
 The evidence presented at the second trial was substantial enough to withstand the motion for a directed verdict or a judgment n. o. v. The central issue at the trial was whether the pilot's negligence was a proximate cause of the crash. Although defendants presented expert testimony to the effect that the pilot had suffered a heart attack shortly after takeoff,[11] the plaintiffs presented evidence that was certainly sufficient to raise doubt in the mind of a reasonable juror that the pilot had suffered a heart attack.[12] Plaintiffs contended at trial that various acts of negligence on the part of the pilot, rather than a heart attack, caused the crash.[13] Any one of the several negligent acts alleged,[14] if proved, would be sufficient to support a jury verdict for plaintiffs. Of these, we discuss in detail only one the pilot's alleged spatial disorientation.
 
 
 14
 The plaintiffs' expert medical witness testified at length that spatial disorientation resulting from the pilot's taking off into a "black hole" was the cause of the crash. See n.12, supra. This theory was buttressed by the testimony of Asher Vandenberg, a commercial, multiengine pilot with instrument ratings.[15] Vandenberg testified that "Natchitoches is the worst (black-out area) I have ever seen" and that a pilot taking off at night to the south "would fly into a black void." Such a takeoff, according to Vandenberg, would severely hinder a pilot's ability to tell by visual reference whether, and how far, the airplane was climbing or turning. Although other pilots testified for defendants that the deceased pilot's takeoff on the night of the crash was proper, all of the evidence on this issue, when viewed in the light most favorable to plaintiffs, Shipman, 411 F.2d at 374, could have led a "reasonable and fair-minded" person to conclude that the pilot was in fact negligent in taking off in the manner that he did. Given all of the evidence on plaintiffs' various theories of negligence and the conflicting evidence concerning the pilot's alleged heart attack, we conclude that the trial judge rightly denied defendants' motion for a directed verdict and let the issue of the pilot's negligence go to the jury.[16] It follows that his denial of defendant's motion for a judgment n. o. v. was proper as well.
 
 
 15
 With respect to the judge's denial of defendants' motion for a new trial, we are bound by an "abuse of discretion" standard. See Conway v. Chemical Leaman Tank Lines, Inc., 610 F.2d 360 (5th Cir. 1980); Spurlin v. General Motors Corp., 528 F.2d 612 (5th Cir. 1976). In light of the evidence outlined above, we find no such abuse here.
 
 Duty of Care
 
 16
 The district court at the August 1977 trial ruled that defendants were "common carriers who owed the plaintiffs' decedent( ) the highest standard of care" with regard to the flight in question. The jury found that the pilot's failure to exercise the highest degree of care was a proximate cause of the airplane crash. Defendants submit that they owed the decedent only a duty of ordinary care and that they are therefore entitled to a judgment in their favor in light of the additional jury finding that the pilot's failure to exercise ordinary care was not a proximate cause of the crash.
 
 
 17
 Defendants concede that a common carrier ordinarily owes one who is a "passenger" the highest duty of care. However, they argue that the decedent lost his status as a "passenger" by carrying marijuana aboard the airplane and thereby became a mere licensee, invitee, or trespasser to whom they owed only a duty of ordinary care.[17] Evidence adduced at trial showed that the decedent was carrying a small amount of marijuana[18] on his person. The thrust of defendants' argument is that their contract of carriage with the decedent is void because it had an illegal purpose: to transport the marijuana.
 
 
 18
 We find defendants' contention on this point to be specious. The purpose of the contract between the defendants and the decedent was to transport the decedent and the other members of the Jim Croce Group, not to transport marijuana. The policy underlying the requirement that a common carrier exercise the highest degree of care is to ensure that it provide safe transportation to those who contract for the use of its services. We agree with the plaintiffs that a common carrier should not be entitled to avoid the high standard of care it owed its passengers "because of some unknown or undisclosed conduct of the passenger, merely incidental to the trip, that happen(s) to be in violation of a statute or regulation."[19] (emphasis added). It makes no sense to say that a common carrier owes a lesser duty of care to a traveler who is carrying a marijuana cigarette or two in his pocket[20] than to a "passenger" seated nearby who is not. Defendants' counsel admitted as much at oral argument,[21] and agreed that a passenger traveling with one marijuana cigarette on his person could not be said to be traveling with the intent to transport it. An airline passenger may be subject to other penalties for transporting a small amount of marijuana in violation of state or federal laws, but he is still entitled to the assurance that a carrier will exercise the utmost degree of care in order to insure his safety. In essence, decedent's carrying a small amount of marijuana aboard the airplane is immaterial for the purpose of determining the degree of care that a common carrier owes its "passengers."
 
 Evidence of Pilot's Prior Conduct
 
 19
 Defendants argue that the district court erred in admitting evidence of the pilot's past conduct to prove that he acted in conformity with that conduct on the evening of the accident in violation of Fed.R.Evid. 404.[22] The trial transcript makes clear, however, that the judge permitted this evidence to be introduced not for the purpose proscribed by Rule 404 but for the limited purpose of rebutting certain opinions given by defendants' experts concerning the pilot's previous deportment as a pilot.[23] We agree with the district court, whose ruling is set out in the margin,[24] that the admission of the evidence for this circumscribed purpose was entirely proper.[25] Moreover, since the defendants themselves, despite repeated warnings by the trial court, "place(d) the general reputation of the pilot in issue, see n.24, supra, they cannot now be heard to complain of the district court's error, if any, in admitting this evidence. See United States v. Spiegel, 604 F.2d 961, 966 (5th Cir. 1979), cert. denied, --- U.S. ----, 100 S.Ct. 2151, 64 L.Ed.2d ---- (1980).
 
 Failure to Appoint Guardian Ad Litem
 
 20
 Defendants submit that the court's failure to appoint a guardian ad litem pursuant to Fed.R.Civ.P. 17(c) constituted reversible error. We disagree. Rule 17(c) authorizes the district court to appoint a guardian ad litem "for an infant . . . not otherwise represented in an action . . . ." Id. (emphasis added). In the instant case the infant was "otherwise represented"; the child's legal guardian, his mother, brought this action on his behalf. Thus, there was no need for the court to appoint a guardian ad litem.
 
 
 21
 Defendants nevertheless contend that the trial court erred in failing even to "consider the question of whether a guardian ad litem should have been appointed to represent the minor Plaintiff."[26] For this proposition, they cite Roberts v. Ohio Casualty Insurance Co., 256 F.2d 35 (5th Cir. 1958). Roberts, however, is clearly distinguishable: in Roberts the children's mother was not a party to the cause of action, and neither she nor any other legal representative pressed the children's interests until after a judgment was entered against them; in the instant case, to the contrary, the child's mother and legal guardian was a party to the lawsuit below and vigorously pressed her child's claims before the trial court. The defendants here have demonstrated absolutely no conflict between Mrs. Cortese's interests and those of her son, nor have they shown any prejudice to the child's interests.[27] We discern no error on the part of the trial court on this issue.
 
 Evidence of Decedent's Future Earnings
 
 22
 Defendants further contend that the district court erred in admitting the testimony of Allen Neuman, a former employee of the organization by which the decedent was employed, and the testimony of decedent's wife concerning the decedent's future earnings because such testimony was speculative and conjectural in nature.[28] In their view, Louisiana law prohibits the consideration of such evidence in awarding damages for the loss of future earnings. However, Louisiana law does not control the issue of whether this evidence should have been admitted in a federal district court;[29] Fed.R.Evid. 403[30] provides the proper standard. Evaluated by that standard, the testimony concerning decedent's future earnings, albeit speculative and conjectural, was properly admitted. Because Louisiana law permits plaintiffs in a wrongful death action to recover for loss of support, which is equivalent to the loss of future earnings, see Viator v. Gilbert, 253 La. 81, 216 So.2d 821, 822 (1968), the testimony was certainly relevant to the issue of damages. Moreover, we are not convinced that the probative value of the evidence was outweighed by the danger of unfair prejudice. The speculative nature of the evidence affects only the weight of the evidence and was therefore properly before the jury.
 
 
 23
 Damages for Mental Anguish and Loss of Affection
 
 
 24
 Defendants complain that the trial court erred in allowing the jury to award $20,000 for loss of "love, affection, counsel, and guidance" and an additional $20,000 for "sorrow, mental anguish, or grief suffered as a result of his (Kenneth Dominick Cortese's) death".[31] We agree with defendants that Louisiana law[32] does not sanction such "double recovery."Louisiana's wrongful death statute provides in pertinent part that "(t)he survivors in whose favor this right of action survives may also recover the damages which they sustained through the wrongful death of the deceased." La.Civ. Code Ann. art. 2315 (West 1979). The statute, by its terms, does not restrict the elements to be considered in assessing damages, and we have previously noted that "Louisiana courts recognize as proper elements of damages (for wrongful death) not only loss of support, loss of contributions, from the decedent, but also loss of society and the grief and anguish of the beneficiaries." Silverman v. Travelers Insurance Co., 277 F.2d 257, 261 (5th Cir. 1960) (footnote omitted).[33] However, no case to which we have been referred stands for the proposition that plaintiffs in a wrongful death action can recover separate monetary awards for loss of love and affection on the one hand and for sorrow and mental anguish on the other.
 
 
 25
 Blancher v. Samuels, 354 So.2d 213 (La.App.) (on reargument), writs denied, 355 So.2d 257, 263 (La. 1978), cited by plaintiffs, acknowledges that damages for wrongful death "include not only loss of support, but also loss of the love and affection of the decedent and the grief and anguish of the survivor," id. at 223, but it does not support their contention that separate awards were proper in the instant case. In fact, Blancher cuts against, rather than in favor of, plaintiffs' contention. The special interrogatory on damages[34] that the judge in Blancher submitted to the jury required the jury to fix a single dollar figure to compensate the plaintiff for both loss of love and affection and grief and mental anguish.[35] Blancher thus cannot be read to support the duplicative recovery permitted in the instant case.
 
 
 26
 Absent a clear expression from the Louisiana courts favoring separate monetary awards for distinct elements of nonpecuniary damages,[36] we decline to authorize separate awards here. Our caution is dictated at least in part by a fear that a contrary decision could result in further "fragmentizing" of awards for nonpecuniary losses in future cases. Moreover, our refusal to award separate damages gains support from 3 Stone, Louisiana Civil Law Treatise § 26 at 32 (1977) (emphasis added):
 
 
 27
 The question whether a survivor could in addition recover damages under the action for wrongful death for distress and mental suffering occasioned by the death is more difficult. In Dobyns v. Yazoo & M. V. R. Co.,[83] the Supreme Court referred to "distress and mental suffering" of the plaintiff but such was due to the "deprivation of her husband's companionship" and so it can be argued that these were merely ways of describing loss of companionship. In Bourg v. Brownell-Drews Lumber Co.[84] the court took into consideration "the mental suffering and deprivation caused to a parent by the death" but again the use of the word "deprivation" could indicate that what was here referred to was loss of affection, companionship etc. The better opinion would seem to be that Judge Monroe in these cases was not creating a separate category of recoverable damage but was merely describing that damage which was included under the heading of loss of society and companionship.
 
 
 28
 83. 119 La. 72, 82, 43 So. 934 (1907).
 
 
 29
 84. 120 La. 1009, 45 So. 972 (1908).
 
 
 30
 Insofar as the district court allowed plaintiffs to recover separately for loss of affection and mental anguish, its judgment is reversed. Plaintiffs are entitled to recover a total of $20,000 for their nonpecuniary losses.
 
 Failure to Give Instruction
 
 31
 Defendants next contend that the trial judge erred in refusing to instruct the jury, as they had requested,[37] that any damages the jury awarded to the plaintiffs would not be subject to federal income taxation. In their brief, defendants observed that "the propriety of an instruction as to the effect of federal income tax law upon the issues (related to damages) is a matter of the proper application of Louisiana law" and proceeded to argue on the basis of Louisiana case law that the trial court's refusal to give their requested instruction constitutes reversible error. At oral argument, however, defendants relied not on Louisiana law but on Norfolk & Western Railway Co. v. Liepelt, --- U.S. ----, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980), decided by the Supreme Court after the submission of briefs in this case, for the proposition that the district court was required to give their requested instruction.
 
 
 32
 We cannot agree with the defendants that Liepelt controls our disposition of this issue; for reasons explained below, we look to state law to determine whether the instruction was required, as defendants contended in their brief. Our reading of the Louisiana cases, unlike defendants', indicates that a trial judge's refusal to give the requested instruction would not constitute reversible error in Louisiana. Accordingly, the district judge's refusal to give the instruction was proper.
 
 
 33
 In Liepelt the administratrix of a fireman's estate brought suit under the Federal Employers' Liability Act (FELA), 45 U.S.C. § 51 et seq., for damages that his survivors suffered as a result of his death. At trial an expert witness testified for plaintiffs that they had suffered damages in the amount of $302,000.[38] An expert witness for defendant sought to testify that the decedent's federal income taxes for the years 1973 through 2000 would have amounted to $57,000. Taking this figure into account and using different assumptions about decedent's future salary and the calculation of the present value of future earnings, defendant's expert estimated plaintiffs' net pecuniary loss to be $138,327. The trial court, however, refused to allow evidence of the decedent's future taxes into evidence and also refused to instruct the jury on the nontaxability of a damage award as requested by defendant. The jury returned a verdict of $775,000. After Illinois appellate courts affirmed, the Supreme Court reversed, holding that the lower court erred both in refusing to admit the evidence and in refusing to give the requested instruction.
 
 
 34
 We are convinced that Liepelt does not control our decision here. The wrongful death action in Liepelt arose under the FELA and not under a state statute, as the instant case did. In our view, this distinction is crucial. In discussing the issue of whether federal or state law governed the propriety of the court's refusal to give the instruction in Liepelt, the Supreme Court specifically acknowledged the federal nature of suits brought pursuant to the FELA:
 
 
 35
 Whether it was error to refuse that instruction, as well as the question whether evidence concerning the federal taxes on the decedent's earnings was properly excluded, is a matter governed by federal law. It has long been settled that questions concerning the measure of damages in an FELA action are federal in character. See, e. g., Michigan Cent. R. Co. v. Vreeland, 227 U.S. 59, 33 S.Ct. 192, 57 L.Ed. 417. This is true even if the action is brought in state court. See, e. g., Chesapeake & Ohio Railway Co. v. Kelly, 241 U.S. 485, 491, 36 S.Ct. 630, 632, 60 L.Ed. 1117.[5]
 
 
 36
 5. One of the purposes of the Federal Employer's Liability Act was to "create uniformity throughout the Union" with respect to railroads' financial responsibility for injuries to their employees. H.R.Rep.No. 1386, 60th Cong., 1st Sess., p. 3 (1908). See also Dice v. Akron, Canton and Youngstown R. Co., 342 U.S. 359, 362, 72 S.Ct. 312, 314, 96 L.Ed. 398; Brady v. Southern Railway, 320 U.S. 476, 479, 64 S.Ct. 232, 234, 88 L.Ed. 239; Hill, Substance and Procedure in State FELA Actions The Converse of the Erie Problem?, 17 Ohio St.L.J. 384 (1956).
 
 
 37
 Id. 100 S.Ct. at 757 and n.5 (emphasis added). In the instant case federal concerns are lacking; this wrongful death action is a statutory creation of the state, and the measure of damages to be recovered, as we noted above, see n.32, supra, is governed by state law. Nor is the need for uniformity throughout the United States, which was "(o)ne of the purposes of the Federal Employer's Liability Act," id., 100 S.Ct. at 757 n.5, implicated in a cause of action brought to vindicate a state-created right. Despite some broad language approving an instruction that informs the jury that an award of damages will not be subject to income tax, see id. 100 S.Ct. at 759, there is no suggestion that the Supreme Court in Liepelt intended to require a trial judge to give such an instruction in wrongful death actions predicated upon state statutes.[39]
 
 
 38
 Moreover, the jury in Liepelt awarded the plaintiffs $775,000, far in excess of the estimation of the plaintiffs' pecuniary loss ($302,000) made by their own expert witness. The Court, noting this discrepancy, opined: "It is surely not fanciful to suppose that the jury erroneously believed that a large portion of the award would be payable to the Federal Government in taxes and that therefore it improperly inflated the recovery." Id. 100 S.Ct. at 759 (emphasis added). At the trial below on the issue of damages, there was no inflation of the recovery beyond the amounts testified to by the expert witnesses. We thus have no reason to suppose, as the Court in Liepelt did, that the jury labored under the misconception that federal taxes would be imposed.
 
 
 39
 Having determined that Liepelt does not control the outcome of this issue, we turn to Louisiana case law to ascertain whether the refusal to give the requested instruction constitutes error in Louisiana.[40] We conclude that it does not. In Guerra v. Young Construction Co., 165 So.2d 882 (La.App.), writ ref'd, 246 La. 864, 167 So.2d 676 (1964), the court held that a refusal to give a similar instruction was not error.[41] The defendants mistakenly contend that DeBose v. Trapani, 295 So.2d 72 (La.App.), writ ref'd, 299 So.2d 359 (La. 1974), repudiated the holding of Guerra. See also Francis v. Government Employers Insurance Co., 376 So.2d 609 (La.App. 1979), writ ref'd, 378 So.2d 1391 (La. 1980). In DeBose the trial court had in fact given the requested instruction; the appellate court merely held that the trial judge had not erred in doing so. 295 So.2d at 74-75. Cf. Francis, 376 So.2d at 612 (following DeBose). The court in DeBose was simply not confronted with the issue presented in Guerra and in the instant case. In the absence of contrary authority,[42] we follow the mandate of Guerra in upholding the district court's refusal to give the instruction.
 
 Conclusion
 
 40
 For the reasons stated above, we affirm the district court's imposition of joint and several liability on Mustang and Roberts Airways for plaintiffs' damages, as modified herein.
 
 
 41
 AFFIRMED in part and REVERSED in part.
 
 
 
 *
 District Judge of the Western District of Louisiana, sitting by designation
 
 
 [1]
 A number of other plaintiffs joined in initiating this action, but they have since settled with the defendants
 
 
 [2]
 Mr. Roberts testified that Roberts Airways and Mustang had a longstanding agreement that Roberts Airways would fly charters that Mustang had booked but could not fly
 
 
 [3]
 After the crash, Mustang paid Roberts Airways $552.35 of the sum it had received from Variety Artists
 There was some evidence presented at trial to show that the plane was not en route to Dallas, as originally scheduled, but to Sherman, Texas, apparently as a result of an agreement between the pilot and the Jim Croce Group. Moreover, the plane left Natchitoches at night, rather than on the following morning as originally planned.
 
 
 [4]
 The parties had stipulated that the plaintiffs would also recover funeral expenses
 
 
 [5]
 The district court rejected plaintiffs' theories of respondeat superior, vicarious liability, and joint venture. These theories are not before us on appeal
 
 
 [6]
 Because we conclude that Mustang is liable on an estoppel theory, we need not decide whether it is liable as an agent for an undisclosed principal. However, we note that several cases suggest that the latter theory is inapposite in the instant case, since there is no evidence to show that Mustang was an agent for Roberts Airways at the time it entered into its contract with the Jim Croce Group. See, e. g., Casey v. Sanborn's, Inc., 478 S.W.2d 234 (Tex.Civ.App. Houston 1972, no writ); Vincent Murphy Chevrolet Co. v. Auto Action, Inc., 413 S.W.2d 474 (Tex.Civ.App. Eastland 1967, writ ref'd n. r. e.)
 
 
 [7]
 a) The Burden of Proof: Mustang misconceives the court's ruling. There was evidence of a custom or practice of Mustang and Roberts not to disclose a substitution of Roberts for Mustang in situations where Mustang was not able to perform a contracted for charter. Mustang booked the Croce charter and retained a substantial portion of the charter fee. One naturally inquires why the fee arrangement existed and why there was a habit and practice of such nondisclosure. The answers are common sense deductions from the evidence. Mustang enjoys enhancement of custom by being able to furnish the requested charter service. That is, Mustang avoids having to disclose to a prospective customer that it is not equipped to deliver. It thereby enjoys greater chance of future business. The ability of Mustang to retain a substantial portion of the fee is reflective of its greater ability (than Roberts) to attract business stemming in no small part from its greater size. One inference is that Mustang has a sufficient edge over Roberts to command such a healthy (as a percentage of the total) referral fee. The Croce group contracted with Mustang thereby expressing in concrete terms their confidence both in Mustang's flying ability and presumably its financial responsibility
 Significantly, there is evidence that Mustang did not disclose the substitution of the smaller charter service, Roberts, and that evidence should be viewed against the background as a practice and custom of nondisclosure of such substitutions.
 There are at least two difficulties with Mustang's burden of proof argument. The first is the presence of evidence of Mustang's nondisclosure. Second, Mustang proceeds upon the assumption that it had no duty to speak. In other words, Mustang argues that the deceased pilot may have told the deceased passengers or the unfortunate passengers may have otherwise learned that there had been a substitution of charter services; that the Croce burden was in any event to adduce proof to negate that possibility. Wholly apart from the direct evidence of nondisclosure, which in this court's view would directly meet the burden of proof argument, if arguendo apposite, Mustang fails to grasp the point that an estoppel can arise from a breach of a duty to speak (See Finding 4a). As stated by the Supreme Court of Texas in Burnett v. Atteberry, 105 Tex. 119, 145 S.W. 582 (1912):
 "An estoppel may arise as effectually from silence, where it is a duty to speak, as from words spoken. One may be induced to act to his injury on account of the silence of one interested in a transaction, and when such course of action is permitted with a knowledge of the interested party or induced by silence or tacit acquiescence, the doctrine of estoppel may be invoked. The rule is tersely but accurately stated by Mr. Bigelow in the following sentence: 'A representation in the nature of a negative of one's rights may, as we have seen, arise from pure silence; and from pure but misleading silence with knowledge, or passive conduct joined with a duty to speak, an estoppel will arise . . .' (Emphasis the courts) . . . 'A party who negligently or culpably stands by and allows another to contract on the faith and understanding of a fact which he can contradict cannot afterwards dispute that fact in an action against the person whom he has himself assisted in deceiving'." Id. Burnett v. Atteberry, 145 S.W. 587 (1912).
 Mustang was under a duty to speak. Mustang did not. The burden of avoidance of this breach of duty by proof that the Croce group learned from sources other than Mustang of the substitution can hardly be placed upon the Croce group.
 (emphasis in original).
 
 
 [8]
 See Barfield v. Howard M. Smith Co., 426 S.W.2d 834 (Tex.1968). We note that the district court, "in the absence of suggestion by the parties to the contrary," looked to Texas law to resolve the agency issue before it. Its action in doing so was proper and is not contested on appeal
 
 
 [9]
 Mr. Linden testified that he could not recall the name of the person to whom he spoke but that the person had offered no objection to the proposed substitution
 
 
 [10]
 See n.7, supra
 
 
 [11]
 Defendants presented the testimony of Dr. William J. Reals, a board-certified pathologist and professor at the University of Kansas School of Medicine, who had examined the pilot's heart after the crash at the request of the FAA. Describing at length the condition of the pilot's heart, including extensive narrowing of the arteries, Dr. Reals testified that he believed the pilot had suffered a heart attack, either "a classic coronary with pain or a cardiac arrhythmia, or a sudden cardiac arrest." He further testified that the pilot would not necessarily have been aware that he had a heart condition prior to the time of the heart attack
 Evidence was also adduced at trial that the pilot, a frequent jogger, unable to secure transportation to the airport, began jogging toward the airport, some three miles away, shortly before flight time. Eventually, he was picked up by local police, interrogated, driven to the airport, and released. In light of this evidence, Dr. Reals testified that the pilot's having jogged so soon before the flight, particularly in conjunction with the stress of takeoff, might well have contributed to the pilot's heart attack.
 
 
 [12]
 Dr. Harry L. Gibbons, a board-certified specialist in aerospace medicine, testified for the plaintiffs that in light of the pilot's medical history and condition, the pilot would "probably" have had symptoms preceding the onslaught of a heart attack, most likely while he was jogging toward the airport. Dr. Gibbons also cited to numerous articles that cautioned against ascribing an unexplained accident to coronary disease in the pilot. As opposed to a heart attack, Dr. Gibbons proffered the theory that, based on his extensive experience, the crash was caused by the pilot's suffering a spatial disorientation as a result of his taking off into a "black hole." A "black hole," according to Dr. Gibbons, is the proper term for a black night takeoff. The jury was thus presented with a credibility choice between the parties' expert witnesses, and it was entitled to believe Dr. Gibbons rather than Dr. Reals
 Moreover, in addition to the testimony of Dr. Gibbons, the plaintiffs sought to impeach the testimony of Dr. Reals during their cross examination of him. Dr. Reals admitted on cross examination that he had twice previously noted that "the possibility of sudden cardiac incapacitation must be considered in evaluating the accident." (emphasis added). Dr. Reals also admitted that his examination of the pilot's heart revealed no evidence of dead heart tissue or fibrosis (scarring); nor was there any evidence of "prior cardial infarct." Plaintiffs' counsel also got Dr. Reals to admit that "in all medical probability a man whose arteries had narrowed as much as the pilot's" would have had some symptoms of cardiac abnormality. Finally, plaintiffs questioned Dr. Reals about a study indicating that persons who died from sudden heart attacks had either an abnormal EKG, high blood pressure, or a history of smoking. It is undisputed that the pilot had none of these characteristics. This impeachment testimony, taken as a whole, in conjunction with the expert testimony of Dr. Gibbons, was sufficient to raise a jury question.
 
 
 [13]
 The parties stipulated that "(p)ost-crash examination of the wreckage revealed no evidence to indicate material failure or mechanical malfunction of the aircraft prior to impact."
 
 
 [14]
 Plaintiffs alleged, inter alia, that the pilot was negligent for taking off downwind into a "black hole," for failing to perform a preflight check, and for taking off when he was in an unstable mental and physical condition
 
 
 [15]
 Vandenberg was also an accident investigator for the Natchitoches sheriff's office. Moreover, he had landed at the Natchitoches airport only 20 minutes before the airplane crash. He was thus well qualified to discuss the particular conditions existing at Natchitoches airport on the night of the crash, as well as the more general characteristics of the airport
 
 
 [16]
 Plaintiffs submit that defendants' violation of certain FAA regulations was an act of negligence per se, citing Maryland Cas. Co. v. United States, 251 U.S. 342, 40 S.Ct. 155, 64 L.Ed. 297 (1920), and United States v. Schultetus, 277 F.2d 322 (5th Cir.), cert. denied, 364 U.S. 828, 81 S.Ct. 67, 5 L.Ed.2d 56 (1960). Both of those cases state that government regulations have the "force and effect of law," but neither case concerns a violation of a governmental regulation by a defendant or addresses the issue of negligence per se. Maryland Casualty dealt with the government's failure to take into account its own regulations in rejecting a taxpayer's claimed deductions, while Schultetus concerned a judge's error in failing to apply certain regulations. However, because we find that there was ample evidence to support the district court's denial of defendants' motions, we need not decide whether defendant's violation of the FAA regulations constituted negligence per se
 
 
 [17]
 Plaintiffs contend that defendants have stipulated that the decedent and other members of the Jim Croce Group were "passengers" and cannot be heard to argue that the decedent was merely a licensee, invitee, or trespasser. However, that stipulation was made only for the purposes of the July 1976 trial in which Mustang's vicarious liability was the sole material issue. We can give no weight to this stipulation in determining the duty of care owed by defendants to plaintiffs' decedent
 
 
 [18]
 According to a criminalistics laboratory report, a plastic bag containing "green vegetable matter" and "foil with green substance" was found on the body of the deceased. After laboratory analysis, the "green vegetable matter" was determined to contain marijuana, and the "green substance" was determined to contain marijuana extract
 Marijuana, hashish, and a variety of other drugs were found on the bodies and in the luggage of other members of the Jim Croce Group, and other controlled substances were found in the aircraft. These additional drugs have no bearing on our decision today. We are presented only with the question of the duty of care owed by defendants to decedent, not to other occupants of the plane or to the Jim Croce Group. There was no evidence adduced at trial to show that these other drugs were the property of the decedent. Thus, only the small amount of marijuana that was found on decedent's body is relevant to our resolution of this issue.
 
 
 [19]
 Moreover, if a carrier's duty to a person onboard an aircraft is determined by whether that person is committing some infraction of a state law, then the duty of care owed to a single individual might well vary in the course of a single interstate or transcontinental flight, as the aircraft passed across state boundaries. We cannot subscribe to such an unpredictable means of determining carrier responsibility to persons onboard its aircraft. Passenger safety is the paramount consideration, and in the absence of a contract for an illegal purpose or of disruptive conduct on the part of the "passenger," see Williams v. Shreveport Yellow Cab Co., 183 So. 120 (La.App.1938), which interferes with the carriage, the standard establishing the highest degree of care must prevail
 
 
 [20]
 See n.18, supra
 
 
 [21]
 In response to a question from the bench that posited this thesis, defendants' counsel replied: "If it's one marijuana cigarette in the man's coat jacket, I think you'd have a good point."
 
 
 [22]
 (a) Character evidence generally. Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:
 (1) Character of accused. Evidence of a pertinent trait of his character offered by an accused, or by the prosecution to rebut the same;
 (2) Character of victim. Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor;
 (3) Character of witness. Evidence of the character of a witness, as provided in Rules 607, 608, and 609;
 (b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
 
 
 [23]
 In his final charge, the judge explained to the jury that he was admitting "evidence of the prior accidents experienced by Robert N. Elliott not because they have any bearing on the cause of the crash now in question but to avoid your possibly concluding (by inference from defendants' experts' testimony) that no such incidents had occurred." He had previously cautioned the jury on a number of occasions that the evidence was being admitted for this limited purpose only
 
 
 [24]
 I want the record to reflect in the Pre-Trial Order it's recited in it Robert N. Elliott held an Airline Transportation Pilot Certificate No. 37153 with airplane single and multi engine ratings, together with a Certified Flight Instructor's Rating, and a current medical certificate. Despite the fact that it was so stipulated the Defendants have repeatedly referred to these certifications in differing factual contexts to communicate to the Jury that Robert N. Elliott was a safe and careful pilot
 In the opening statement of the Counsel, both defense Counsel specifically told the Jury that they intended to show that the pilot was extremely capable, experienced and in general possessed traits of being a safe pilot.
 During the trial, despite the warnings of the Court that the defense Counsel were attempting to place the general reputation of the pilot in issue, the defense Counsel have persisted and the Defendants have asked hypothetical questions of the expert witness now on the stand and others as to the cause of the accident, which assumes for the purposes of expressing the opinion that Robert Elliott was experienced by virtue of his large number of hours and in general possessed traits of being a safe pilot and in general he was a pilot competent of good judgment.
 In sum, the Defendants have calculatedly placed in evidence opinion evidence that Robert Elliott was a safe pilot and that because of his total hours and certifications adhered to such safe practices all leading to the conclusion hoped for by Defendants that he was unlikely to have made a mistake on this take-off.
 Now, seems to me this character of evidence as to the reputation or opinion of Robert Elliott as a safe pilot is not proper evidence that Elliott adhered to safe practices at the time of the accident. At the same time where the Defendants have, despite the admonitions of the Court, and under circumstances which eliminate any possibility of inadvertence, elicited testimony which is no more than or no less than opinions as to Robert Elliott's traits and judgments that adheres to safe practices of the pilot.
 The Plaintiffs must be able to resist under Rule 405. The Court is sensitive to the distinction between matters of habit and custom and general reputation. The Court has labored to avoid receipt in evidence of prior specific acts of this pilot but in the posture of the case, which is a direct result of the efforts of the Defense Counsel to not allow this Jury to learn of this pilot's record, will not avoid potential prejudice but would affirmatively mislead them particularly in the factual context of this case.
 The record of Robert N. Elliott should have remained a neutral circumstance but Defendants chose not to leave it in this posture, that is to say that Defendants could not have informed the Jury of Robert N. Elliott's background, including his certifications, but Defendants by no means confined themselves to such information.
 For all those reasons, and for the reasons which the Court will articulate after the verdict, the Plaintiff will be allowed hereafter to cross examine with regard to the prior record of Mr. Elliott and its effect upon the opinions of the witnesses and to offer into evidence affirmatively his record.
 
 
 [25]
 American Airlines, Inc. v. United States, 418 F.2d 180 (5th Cir. 1969), is not to the contrary. In American Airlines we articulated "the rule that evidence of a similar act of negligence is not admissible to prove negligence in performing the same act later." Id. at 197 (citations omitted). We nevertheless held the evidence at issue to be admissible because it was presented in support of another theory. Id. In this case evidence of the pilot's prior conduct was not presented to prove he was acting in conformity with a previous negligent act; it was therefore properly admitted under the American Airlines rationale
 
 
 [26]
 In this regard, defendants point out that plaintiffs presented no proof of guardianship until the time of this appeal
 
 
 [27]
 Nor, of course, have they shown any prejudice to themselves
 
 
 [28]
 For the sake of clarity, we first outline below certain background information so as to provide a context within which the challenged testimony can be viewed
 From September 1972 until his death, plaintiffs' decedent was a road manager for Variety Theatre International, Inc. ("Variety Theatre"), an organization that booked and produced concerts for colleges throughout the United States. At the time of the fatal accident, he was managing the tour of the Jim Croce Group. For his services the decedent was paid $700 per month, plus a yearly bonus of $400-500. In addition, all of his tour-related expenses were paid while he was on tour.
 In July 1974, the president of Variety Theatre sold the corporation to his associates, who put up $15,000 apiece (except for one who put up $30,000). The new organization, named Variety Artists International, Inc. ("Variety Artists"), was identical to Variety Theatre except that each of the purchasers became an officer of the new corporation, and the former president was removed. Otherwise, all of Variety Theatre's employees were retained by Variety Artists.
 Against this factual background, we recount the testimony to which the defendants object. Allen Neuman, a former road manager for Variety Theatre, testified that he had been trained for that position by the decedent. He disclosed that in September 1973, at the time of the airplane crash, his salary was $600 per month. Mr. Neuman testified that in July 1974, at the time of the corporate changeover, he had borrowed $15,000 from a bank in order to buy into Variety Artists; his salary at that time was approximately $12,000 annually. By his calculations, his salary had risen to $16,000 annually by July 1976. Mr. Neuman revealed that he had become a booking agent in November 1974. On the basis of his experience as a booking agent, he averred that the decedent would have been a good salesman and would still have been employed by Variety Artists. Defendants complain of the admission of Mr. Neuman's testimony as a "yardstick" by which to measure the decedent's future earnings.
 Defendants also object to certain testimony given by decedent's wife to the effect that her parents had the means to extend a $15,000 loan to the decedent so that he could have purchased a share in Variety Artists had the opportunity presented itself. After a lengthy discussion outside the presence of the jury, the court allowed this testimony in, ruling that her parents' ability to make a loan was a question of fact for the jury. Defendants also raise on appeal the admissibility of her testimony that the decedent had wanted to become a booking agent for Variety Artists.
 Curiously, defendants do not object to the admission of the testimony of Lloyd St. Martin, former office manager and travel coordinator of Variety Theatre and an officer of Variety Artists. Mr. St. Martin testified that decedent was likely to have become a booking agent or salesman for Variety Artists at a substantially higher salary had he survived. Like Mr. Neuman, Mr. St. Martin had bought into Variety Artists. When Mr. St. Martin was asked if he would have to assume that the decedent had "$15,000 he could have put up to buy into Variety Artists," Mr. St. Martin responded that the decedent "would probably have done what everyone else did" buy into the new corporation.
 
 
 [29]
 Although we need not decide whether the evidence at issue here would be admissible in a Louisiana court, we note here several cases suggesting that conjectural evidence concerning future earnings would be admissible. See Jordan v. Travelers Ins. Co., 257 La. 995, 245 So.2d 151, 154-55 (1971); Viator v. Gilbert, 253 La. 81, 216 So.2d 821, 822-23 (1968)
 
 
 [30]
 Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence
 
 
 [31]
 The judge submitted the following special issue to the jury. The jury's answers are indicated in the appropriate spaces
 What amount of money, if any, if now paid in cash do you find from a preponderance of the evidence would fairly and reasonably compensate Linda and Eric Cortese for their pecuniary loss resulting from the death of Kenneth Dominick Cortese?
 In answering the question inquiring into what sum of money if now paid in cash, you should keep in mind that money in hand is more valuable than money received at a later date. Accordingly, you should apply a discount factor in accordance with the evidence in arriving at the sum to be awarded.
 In connection with this question, you may consider the following elements: (a) care, maintenance, and support; (b) household services; (c) love, affection, counsel, and guidance; and (d) sorrow, mental anguish, or grief suffered as a result of his death.
 Answer in dollars and cents, if any, as to each:
 
 
 [32]
 The district court correctly held that Louisiana's wrongful death statute, La.Civ. Code Ann. art. 2315 (West 1979), applied. See Gutierrez v. Collins, 583 S.W.2d 312, 315 (Tex. 1979); Marmon v. Mustang Aviation, 430 S.W.2d 182 (Tex. 1968)
 
 
 [33]
 Cf. Dobyns v. Yazoo & M. V. R. Co., 119 La. 72, 43 So. 934 (1907) (permitting recovery for loss of love and affection); Cambrice v. Fern Supply Co., 285 So.2d 863, 866 n.5 (La.App. 1973) (allowing compensation for mental suffering by surviving relative if he is not deprived by a higher-ranked survivor)
 
 
 [34]
 10. What sum of money, paid in cash today, would fairly compensate Mrs. Nancy Nuebel Blancher for the death of her husband in each of the following respects:
 (c) The amount to reasonably reimburse her for the loss of her husband's love and affection and the grief and mental anguish she may have sustained and might reasonably continue to sustain as a result thereof . . . .
 
 
 [354]
 So.2d at 222-23
 
 
 [35]
 The court in Blancher held that the jury had erred "as a matter of law in refusing to fix any (damages) at all when the facts show entitlement to some amount." 354 So.2d at 223
 
 
 [36]
 Cf. Marceleno v. State Department of Highways, 367 So.2d 882, 889 (La.App. 1978) (contrasting nonpecuniary loss with pecuniary loss), writ ref'd 369 So.2d 1364 (La. 1979)
 
 
 [37]
 I charge you as a matter of law, that any award made to the plaintiffs in this case, if any is made, is not income to the plaintiffs within the meaning of the federal income tax law. Should you find the plaintiffs are entitled to an award of damages, then you are to follow the instructions already given you by this Court in measuring those damages, and in no event should you either add to or subtract from that award on account of federal income taxes
 
 
 [38]
 The witness arrived at this figure by taking the decedent's expected gross earnings, adding the value of services he would have rendered to his family, subtracting the amounts that the decedent would have spent on himself, and then discounting the total to its present value at the time of trial
 
 
 [39]
 The dissent, in fact, explicitly recognizes that state law governs questions such as the one raised here unless the state law contravenes federal policies:
 This Court, to be sure, has asserted federal control over a number of incidents of state trial practice that might appear to be procedural, and has done so out of concern, apparently, for protecting the rights of FELA plaintiffs. See, e. g., Brown v. Western R. of Alabama, 338 U.S. 294, 70 S.Ct. 105, 94 L.Ed. 100 (1949) (a State cannot apply, in a FELA case, its usual rule that pleadings are construed against the pleader); Dice v. Akron C. & Y. R. Co., 342 U.S. 359, 72 S.Ct. 312, 96 L.Ed. 398 (1952) (FELA plaintiff is entitled to a jury trial in state court notwithstanding a contrary state rule); C. Wright, Law of Federal Courts 195-196 (3d ed. 1976); Hill, Substance and Procedure in State FELA Actions The Converse of the Erie Problem?, 17 Ohio St.L.J. 384 (1956). I agree, of course, that state rules that interfere with federal policy are to be rejected, even if they might be characterized as "procedural." See, e. g., Note, State Enforcement of Federally Created Rights, 73 Harv.L.Rev. 1551, 1560-1561 (1960). See generally Note, Procedural Protection for Federal Rights in State Courts, 30 U.Cin.L.Rev. 184 (1961). I cannot conclude, however, that a purely cautionary instruction to the jury not to misbehave implicates any federal interest. This issue truly can be characterized as one of the "ordinary incidents of state procedure," Dickinson v. Stiles, 246 U.S. 631, 633, 38 S.Ct. 415, 416, 62 L.Ed. 908 (1918), which should be governed by state law.
 
 
 [100]
 S.Ct. at 762-63 (Blackmun, J., dissenting)
 
 
 [40]
 Whether giving the instruction is desirable as a matter of policy is not the question before us; we need decide only whether the refusal to instruct requires us to reverse and remand this case for a new trial
 
 
 [41]
 Charge No. 5 sought to instruct the jury not to add any amount to the actual damages any sum designed to offset income tax on the recovery, since the recovery is nontaxable. The judge instructed the jury properly as to the compensatory nature of damages, and specifically listed nine items which the jury might consider. Refusal to give the charge requested by defendants was not error. See 15 Am.Jur. Damages Sec. 369
 Id. at 887.
 
 
 [42]
 Reeves v. La. & Ark. Ry. Co., 304 So.2d 370 (La.App.), writ ref'd, 305 So.2d 123 (La. 1974), did not involve jury instructions and is not apposite here